**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| PCS NITROGEN, INC., | ) | Case No. 2:09-cv-03171-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| ROSS DEVELOPMENT | ) | |
| CORPORATION; T. HEYWARD | ) | |
| CARTER, JR.; GRAYSON G. | ) | |
| HANAHAN; WILLIAM O. | ) | |
| HANAHAN, III; KATHARYNE H. | ) | |
| RIKE; ESTATE OF G.L. BUIST | ) | |
| RIVERS, JR.; MIKELL R. | ) | |
| SCARBOROUGH; C. COTESWORTH | ) | |
| PINCKNEY AND T. HEYWARD | ) | |
| CARTER, AS CO-TRUSTEES OF THE | ) | |
| TRUST OF WILLIAM O. HANAHAN, | ) | |
| JR.; ANN HANAHAN BLESSING; | ) | |
| DONALD BUHRMASTER, III; | ) | |
| ELEANOR W. CARTER; MARGARET | ) | |
| H. CARTER; ELIZABETH H. CLARK; | ) | |
| MARIA GRAYSON-METAXAS; | ) | |
| BUIST L. HANAHAN; ELIZABETH A. | ) | |
| HANAHAN; FRANCES G. | ) | |
| HANAHAN; MARY ROSS | ) | |
| HANAHAN; MURIEL R. HANAHAN; | ) | |
| ROGER PARKE HANAHAN, JR.; | ) | |
| GRAYSON C. JACKSON; ORIANA H. | ) | |
| KIRBY; AND JEANNE DEFOREST | ) | |
| SMITH HANAHAN, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the various post-trial motions of the Ross Directors, the

Ross Shareholders, and PCS Nitrogen, Inc. ("PCS").

1

# I.     Relevant Factual and Procedural Background

The claims in this case arise out of litigation that resolved liability under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") for the remediation of the Columbia Nitrogen Superfund Site ("Site") in Charleston, South Carolina. *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, Case No. 2:05-cv-02782-MBS (D.S.C.) (hereinafter *Ashley II*).  Both PCS and Ross Development Corp. ("Ross") are former owners and operators of the Site that were parties to the *Ashley II* action and were found liable for response costs at the Site.  PCS brought this action on December 8, 2009, to recover funds from Ross, T. Heyward Carter, Jr. ("Carter"); Grayson G. Hanahan; William O. Hanahan, III ("Hanahan"); Katharyne H. Rike ("Rike"); Mikell R. Scarborough ("Scarborough"); and the Estate of G.L. Buist Rivers ("Rivers")  (collectively the "Ross Directors"); as well as C. Cotesworth Pinckney and T. Heyward Carter as co-trustees of the Trust of William O. Hanahan, Jr.; Anne Hanahan Blessing; Donald Buhrmaster, III; Eleanor W. Carter; Margaret H. Carter; Elizabeth H. Clark; Maria Grayson-Metaxas; Buist L. Hanahan; Elizabeth A. Hanahan; Mary Ross Hanahan; Muriel R. Hanahan; Roger Parke Hanahan, Jr.; Grayson C. Jackson; Orianna H. Kirby; and Jeanne Deforest Smith Hanahan (collectively the "Ross Shareholders").[1]   ECF No. 1.  PCS dismissed

---

[1] Because not all shareholders of Ross and not all directors of Ross during the relevant period are defendants in this action, the universe of shareholders and directors is necessarily broader than those individuals encompassed in the terms "Ross Shareholders" and "Ross Directors."  When referring only to the parties to this action, the Court will use the terms "Ross Shareholders" and "Ross Directors." However, when discussing groupings of shareholders or directors including individuals not named as defendants in this action, or when discussing events involving more than the named parties, the court will not use the capitalized terms "Ross Shareholders" and "Ross Directors."

its claim against the Estate of G.L. Buist Rivers on June 10, 2011 (ECF No. 91), and against Maria Grayson-Metaxas on July 17, 2014 (ECF No. 294).

PCS proceeded to trial on three of the causes of action in its Amended Complaint: (1) an action under the Statute of Elizabeth (S.C. Code Ann. § 27-3-10(A)) to set aside alleged fraudulent conveyances brought against Ross, the Ross Directors, and the Ross Shareholders; (2) an action for an alleged civil conspiracy brought against the Ross Directors; and (3) a direct claim for alleged breach of fiduciary duty brought against the Ross Directors.  ECF No. 34.

The underlying facts are fully stated in the Amended Findings of Fact and Conclusions of Law which accompany this order.  In brief, however, Ross is liable for remediation costs at the Site.  PCS alleges that it is bearing those costs and is entitled to contribution from Ross for those costs, making it a creditor of Ross.  PCS alleged that the Ross board of directors knew about Ross's potential environmental liability for the Site and then dissolved Ross in 2006 with the intent to evade that liability after distributing all of the corporation's assets to its shareholders. Ross itself is now a dissolved corporation and no longer exists.

The parties tried the equitable claim for fraudulent conveyance to the court at the same time as they tried the two legal claims to the jury.  At the conclusion of the trial on July 31, 2014, the jury returned a verdict for the Ross Directors on the civil conspiracy claim and a verdict for PCS in the amount of $5,555,158.00 against the Ross Directors on the breach of fiduciary duty claim. ECF No. 319.  According to the joint stipulations submitted to the jury, $5,555,158.00 is the exact amount of all distributions to all the shareholders of Ross from 1999 to 2006, when Ross dissolved.  ECF No. 312.  The jury declined to award PCS punitive damages.  ECF No. 319.

At an August 19, 2014, hearing, Defendants moved for judgment as a matter of law on the fraudulent conveyance claim. ECF No. 325. The court ordered the parties to prepare briefs addressing whether the jury's verdict provided PCS with an adequate remedy at law that precluded its recovery of equitable relief. *Id.* Those briefs were submitted to the court by September 12, 2014. ECF Nos. 326, 327, 328, and 329. On October 29, 2014, this court determined that the jury's verdict did not preclude the court from awarding PCS relief under its fraudulent conveyance claim. ECF No. 344. The court did, however, dismiss without prejudice PCS's claim to the extent that it was also brought against the Ross Directors—Carter, Grayson Hanahan, Hanahan, Rike, and Scarborough—because the breach of fiduciary duty claim tried to the jury provided an adequate remedy at law precluding equitable relief as to those Defendants. *Id.* at 8. The court permitted PCS's fraudulent conveyance claim to proceed against the Ross Shareholders. *Id.*

PCS's fraudulent conveyance claim alleged that the Ross Directors knew of contamination at the Site and that Ross could be liable for such contamination when the Ross Directors approved all the distributions to the Ross Shareholders from 1992 through 2006.[2] On February 12, 2015, the court issued its Findings of Fact and Conclusions of Law disposing of PCS's fraudulent conveyance claim. ECF No. 345. A detailed recitation of the facts of this case can be found therein. *Id.* at 1-28. For the purposes of this order, however, the following conclusions of the court are particularly relevant. The court concluded that cash transfers may be voided under the Statute of Elizabeth, *id.* at 33-34; that the challenged transfers were

---

[2] In its fraudulent conveyance claim, PCS challenges only the distributions from 1998 to 2006. Summ. J. Hr'g Tr. 22:23-23:6 (ECF No. 343).

intrafamily transfers and, therefore, Ross bore the burden of proof, *id*. at 36-40; that Ross had not

shown valuable consideration was exchanged for the transfers*, id*. at 40-41; and that Ross had

not shown the bona fides of the transfers, *id*. at 41-43.  Accordingly, the court declared the

transfers to the Ross Shareholders void, *id*. at 43, and ordered that a constructive trust be placed

over the funds, *id*. at 44.  The various amounts of the voided transfers can be found in Appendix

A to the Findings of Fact and Conclusions of Law.  *Id*. at 47-51.  The sum total of the voided

transfers was $4,123,736.88.

On March 12, 2015, the Ross Directors filed a motion for a judgment as a matter of law

notwithstanding the verdict, or, alternatively, for remittitur.  ECF No. 351.  PCS filed a response

in opposition on April 27, 2015.  ECF No. 364.  Ross filed a reply on May 15, 2015.  ECF No.

368.  Also on March 12, 2015, the Ross Shareholders filed a motion for reconsideration of

various parts of the court's Findings of Fact and Conclusions of Law.  ECF No. 352.  PCS filed a

response in opposition on April 27, 2015. ECF No. 363.  Ross filed a reply on May 15, 2015.

ECF No. 369.  Finally, on April 27, 2015, when it filed its responses to Ross's two post-trial

motions, PCS also moved for sanctions against the Ross Directors and the Ross Shareholders.

ECF Nos. 361 and 362.  Ross filed responses in opposition on May 15, 2015.  ECF No. 370.

PCS filed replies on May 26, 2015.  ECF Nos. 371 and 372.

## II.    Judgment as a Matter of Law Notwithstanding the Verdict

The Ross Directors move pursuant to Federal Rule of Civil Procedure 50(b) for judgment

as a matter of law notwithstanding the verdict.  *See generally* ECF No. 351; Fed. R. Civ. P.

50(b).

### A.    Legal Standard

Rule 50(b) provides: "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a) [i.e., after a party has been fully heard on an issue], the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  Fed. R. Civ. P. 50(b).  "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  *Id.*

When a jury has returned a verdict, the court may grant a Rule 50(b) motion for judgment as a matter of law only if, "'viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party.'" *Pitrolo v. Cnty. of Buncombe,* 407 F. App'x 657, 659 (4th Cir. 2011) (quoting *Int'l Ground Transp. v. Mayor & City Council of Ocean City,* 475 F.3d 214, 218–19 (4th Cir. 2007)). If reasonable minds could differ, the court must affirm the jury's verdict. *Id.* (citing *Dennis v. Columbia Colleton Med. Cntr., Inc.*, 290 F.3d 638, 645 (4th Cir. 2002)).

In drawing all reasonable inferences in favor of the non-movant, the court may not weigh the evidence or assess the credibility of the witnesses. *Id.* (citing *Dennis,* 290 F.3d at 645).  "A renewed motion for judgment as a matter of law is not an occasion for the [c]ourt to usurp the jury's authority to weigh the evidence and gauge the credibility of witnesses." *Thompson v. Direct Impact, Co.,* 63 F. Supp. 2d 721, 723 (E.D. Va. 1998), *aff'd* 188 F.3d 503 (4th Cir. 1999) (citing *Taylor v. Home Ins. Co.,* 777 F.2d 849, 854 (4th Cir. 1985)). "[T]he defendant bears a 'heavy burden' in establishing that the evidence is insufficient to uphold the jury's verdict." *Id.*

6

(citing *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996)); *see also Liberty Mut. Ins. Co. v. Employee Resource Mgmt., Inc.*, 176 F. Supp. 2d 510, 514-15 (D.S.C. 2001).

Ross asserts seven reasons why it believes the Ross Directors are entitled to judgment as a matter of law:

1. PCS offered no proof of its damages and, therefore, the jury's determination of damages was conjectural.

2. PCS was not a creditor at the time of the distributions.

3. There is no common law breach of fiduciary duty claim against corporate directors in South Carolina.

4. Even if there is such a claim, the Ross Directors cannot be liable because: (a) they did not know the identity of the alleged creditors at the time of the distributions; (b) there is no personal liability for directors to creditors in the absence of deceit; (c) there was no evidence to support a finding that Ross was insolvent; and (d) liability of the Ross Directors must be capped at the amount they preferred themselves over creditors, i.e. at the amount of distributions to *themselves* rather than all shareholders.

5. PCS's claim is barred by the statute of limitations.

6. The Ross Directors were entitled to a jury instruction on the business judgment rule and were protected by it.

7. PCS cannot "enforce collection against Ross Development Corporation and the Former Directors" until it has borne more than its 30% share of response costs at the Site. *See* ECF No. 351 at 18.

The court addresses each of these seven objection below, albeit in a differing sequence.

### B. Availability of a Common Law Breach of Fiduciary Duty Claim to a Creditor Against Corporate Directors of an Insolvent Corporation

The most fundamental argument the Ross Directors make against the jury verdict is that there is no common law breach of fiduciary duty cause of action against corporate directors available to creditors under South Carolina law. The Ross Directors contend that such a cause of

7

action, if one ever existed, was extinguished[3] by the enactment of the South Carolina Business

Corporation Act of 1988, S.C. Code Ann. §§ 33-1-101 *et seq*. ("the Act").[4]  The court previously

considered this issue in denying Ross's motion to dismiss in September of 2010 (ECF No. 30 at

15-16) and in denying Ross's motion for summary judgment in April of 2014 (ECF Nos. 236 &

241).

### *1. Common Law Fiduciary Duties Owed Creditors by Directors of an Insolvent Corporation Survived the Enactment of the South Carolina Business Corporation Act*

The Ross Directors' argue that the Act codifies the standards of conduct applicable to

corporate directors in S.C. Code Ann. § 33-8-300.  That section provides that directors must

exercise their duties in good faith, with ordinary care, and in the best interests of the corporation

and its shareholders.  The Act further sets forth circumstances when a director is prohibited from

authorizing distributions to shareholders and a director's liability for such unlawful distributions.

S.C. Code Ann. §§ 33-6-400 and 33-8-330.  In interpreting the Act, the South Carolina Supreme

court held in *Clearwater Trust v. Bunting*, 626 S.E.2d 334, 338 (S.C. 2006), that "[t]he common

law fiduciary duty, first recognized in 1913, owed to shareholders by corporate officers and

directors has been codified by §§ 33-8-300 and -420," and concluded that shareholders' common

law breach of fiduciary duty claims against corporate directors, also called shareholder

---

[3] "[D]isplaced and superseded," in the Ross Directors' words.  ECF No. 351 at 26.

[4] Ross also argues that the Act "does not provide a creditor a cause of action against the directors of a corporation for unlawful distributions under Sections 33-6-400 and 33-8-330."  *Id*. at 28.  Ross is correct.  The court agrees that the Act itself provides no such cause of action.  If such a cause of action exists, it does so by operation of the common law and not by virtue of any remedy reposed in the Act.

derivative actions, "must be brought within the statute's terms." [5]

All five of the *Clearwater Trust* justices agreed, however, that the Act in no way "abrogates" the common law duties of directors owed to shareholders, much less those owed to creditors. *Compare Clearwater Trust*, 626 S.E.2d at 338 n.2 (majority opinion) ("The dissent would find that the Act does not abrogate the common law duties. We agree that those duties have not been abrogated, that is, 'annulled, cancelled, repealed or destroyed' as that term is defined in Black's Law Dictionary, but rather hold that the duties have been codified, as is the Legislature's prerogative."), *with id.* at 341 (Moore, J., dissenting) ("I would find that the common law causes of action alleged were not abrogated by [the Act]. Simply because the General Assembly enacted a statute addressing the fiduciary duty owed to shareholders by corporate officers or directors does not mean that it intended to abrogate all common law causes of action involving corporate officers or directors and shareholders."); *see also Davis v. Hamm*, 387 S.E.2d 676, 678 (S.C. Ct. App. 1989) (rejecting a trial court's determination that the Act "statutorily abrogated" earlier "well-established principles" of shareholder derivative suits articulated in precedent predating passage of the Act); Gregory B. Adams, *The 1981 Revision of the South Carolina Business Corporation Act*, 33 S.C. L. Rev. 405, 408 (1982) (observing in the context of the Act's 1981 predecessor: "The general nature and scope of the statute are significant. First, the section does not directly create a statutory cause of action or give the common-law right a statutory basis; it merely places procedural limits on the judicially recognized action. Second, it limits only shareholder derivative actions and restricts neither

---

[5] It appears that shareholder derivative suits were recognized under the law of South Carolina much before 1913. The cases go back as far as *Charleston Ins. & Trust Co. v. Sebring*, 26 S.C. Eq. (5 Rich. Eq.) 342 (1853).

creditor derivative actions nor class or individual actions on behalf of shareholders in their own right."). Thus, the discussion in *Clearwater Trust* related only to the remedies available to shareholders.

This case, however, does not involve a claim by a shareholder, but, rather, a claim by a creditor. Neither the Act itself nor the *Clearwater Trust* court makes any mention of the rights of creditors or the fiduciary duties owed to them and cannot, therefore, be said to codify, abrogate, or otherwise disturb any common law duty owed by corporate officers or directors to creditors or any common law cause of action available to creditors to enforce these common law rights. The pertinent question is, instead, whether South Carolina recognizes a common law fiduciary duty owed creditors by corporate directors or officers of an insolvent corporation.

Notwithstanding the Ross Directors' arguments to the contrary, the court concludes that directors of a corporation owe the same fiduciary duties to creditors when the corporation is insolvent that directors owe shareholders when the corporation is solvent. This conclusion is in accord with mandatory authority from the Fourth Circuit interpreting South Carolina law on the matter. *See FDIC v. Sea Pines Co.*, 692 F.2d 973, 976-77 (4th Cir. 1982) ("[W]hen the corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors."); *see also Davis v. Wolf*, 147 F.2d 629, 633 (4th Cir. 1945) (quoting *Arnold v. Knapp*, 84 S.E. 895, 899 (W. Va. 1915)) ("[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors . . . .") (applying West Virginia law).

The South Carolina Supreme Court recognized this so-called "trust fund theory" over a hundred years ago, *Hutchison v. Rock Hill Real Estate & Loan Co.*, 43 S.E. 295, 302 (S.C.

10

1902) ("When the corporation becomes insolvent, the directors become trustees for the corporation creditors.") (internal quotations and citation omitted), and the Supreme Court has had occasion in the decades following to reiterate the principle. *See, e.g.*, *Beckroge v. S.C. Power Co.*, 15 S.E.2d 124, 128 (S.C. 1941) (confirming "the rule that until the assets of a corporation have passed into the hands of bona fide creditors or purchasers for value, as long as any debts of the corporation are unpaid, the holders of the assets take them charged with a trust in favor of the creditors"); *Rice v. City of Columbia*, 141 S.E. 705, 712 (S.C. 1928) ("[T]he very moment a corporation, banking or other, reaches the point of insolvency (presumptively, as a matter of course, to the knowledge of the managing agents of the corporation), certainly in the immediate prospect of dissolution and bankruptcy, its assets become impressed with a solemn trust to be distributed ratably among its creditors, subject, of course, to liens; and the managing agents become the administrators of that trust."); *see also Stewart v. Ficken*, 149 S.E. 164, 165 (S.C. 1929) (recognizing the right of a creditor to sue a corporate director for breach of fiduciary duty); *Cumberland Wood Prods., Inc. v. Bennett*, 417 S.E.2d 617, 619 (S.C. Ct. App. 1992) (citing *Sea Pines Co.*, 692 F.2d at 977).

The federal bankruptcy courts of this District also affirm the continuing validity of the principle. *See In re S. Textile Knitters, Inc.*, No. 98-07203-W, 2000 WL 33709685, at *22 (Bankr. D.S.C. July 27, 2000) ("[I]t is apparent that the elements of S.C. Code § 33–8–300 [regarding the duties of corporate directors] are to be adhered to with respect to creditors once the fiduciary's corporation is insolvent.") *subsequently aff'd in part, rev'd in part on other grounds*, 65 F. App'x 426 (4th Cir. 2003); *In re BHB Enters., LLC*, No. ADV. 97-80227-W, 1998 WL 2016846, at *13 (Bankr. D.S.C. Sept. 30, 1998) ("When a corporation becomes

insolvent, fiduciary duty of the directors shifts to the creditors of the corporation.").

South Carolina is by no means an outlier in recognizing the existence of a fiduciary duty owed by directors of an insolvent corporation to the corporation's creditors. *See* 19 C.J.S. Corporations § 633 ("When the corporation becomes insolvent, however, a trust or quasi-trust relationship arises between the directors and creditors."); Andrew D. Shaffer, *Corporate Fiduciary-Insolvent: The Fiduciary Relationship Your Corporate Law Professor (Should Have) Warned You About*, 8 Am. Bankr. Inst. L. Rev. 479, 511-535 (2000) (exploring the justifications of fiduciary duties owed to creditors); *see also Bank of Am. v. Musselman*, 222 F. Supp. 2d 792, 799 n.16 (E.D. Va. 2002) (collecting cases applying the law of eleven states, all of which recognize a fiduciary duty of some sort running from directors to creditors upon corporate insolvency).

Several courts have summarized the economic reasoning behind the shift of fiduciary duty from shareholders to creditors upon corporate insolvency. When solvent, a corporation's creditors' rights are protected by the law of contract, whereas shareholders, as the residual owners of the corporation, bear the risk of officers' or directors' mismanagement and are thus owed a fiduciary duty. Upon insolvency, however, creditors displace shareholders as the residual owners of the corporation. Upon insolvency, then, creditors rather than shareholders bear the whole risk of mismanagement and are, therefore, owed the fiduciary duties formerly owed shareholders. *Musselman*, 222 F. Supp. 2d at 799 n.16; *In re Ben Franklin Retail Stores, Inc.,* 225 B.R. 646, 653 (Bankr. N.D. Ill. 1998); *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 787 (Del. Ch. 1992).

The court concludes that (1) South Carolina recognizes common law fiduciary duties owed creditors by corporate officers and directors upon corporate insolvency and that (2) the codification in the Business Corporation Act of the duties owed by corporate officers and directors to shareholders did not alter or destroy the common law fiduciary duties owed creditors upon insolvency.  The court further concludes that there is a common law cause of action available to creditors for breach of the fiduciary duties owed them upon insolvency.  The Ross Directors' argument that the Act precludes PCS's claim of breach of fiduciary duty is without merit.

### 2. Sections 33-6-400 and 33-8-330 of the South Carolina Business Corporation Act Do Not Preclude Suits by Creditors Because These Sections Define Only a Shareholder's Rights to Challenge Distributions Rendering a Corporation Insolvent

The Ross Directors next argue that even if directors of an insolvent corporation owe fiduciary duties to creditors independent of the Act, the Act nonetheless "establishes the sole test for determining whether a distribution is proper" and limits a director's liability for improper distributions "only to the corporation."  ECF No. 351 at 28-29.

Section 33-6-400 addresses when distributions may not be made and provides in relevant part:

> (c) No distribution may be made if, *after giving it effect*:
>
> (1) the corporation would not be able to pay its debts as they become due in the usual course of business; or
>
> (2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

13

> (d) The board of directors may base a determination that a distribution is not prohibited under subsection (c) either on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances.

S.C. Code Ann. § 33-6-400 (emphasis added).[6]

Ross further argues that Section 33-8-330 limits the liability of a director pursuant to section 33-6-400 to only the corporation itself, excluding any liability to creditors. S.C. Code

---

[6] Ross would have the court read this section as additionally providing the sole permissible basis for determining corporate insolvency. Such a reading, however, runs counter to the Official Comments, which distinguishes the causes of action available to shareholders from those available to creditors. Comment 3 notes:

> The revised Model Business Corporation Act establishes the validity of distributions from the corporate law standpoint under section 6.40 (Section 33-6-400) and determines the potential liability of directors for improper distributions under sections 8.30 and 8.33 (Section 33-8-300 and 33-8-330). The federal Bankruptcy Act and state fraudulent conveyance statutes, on the other hand, are designed to enable the trustee or other representative to recapture for the benefit of creditors funds distributed to others in some circumstances. *In light of these diverse purposes, it was not thought necessary to make the tests of section 6.40 (Section 33-6-400) identical with the tests for insolvency under these various statutes.*

S.C. Code Ann. § 33-6-400 (Official Comment 3) (emphasis added). This Comment suggests that the remedies provided in the Act are not intended to displace concurrent remedies available to creditors under the federal Bankruptcy Act or state fraudulent conveyance statutes, in particular, because of the "diverse purposes" served by the remedies provided shareholders and those provided creditors. Not only does this comment refute Ross's argument as to the appropriate insolvency test to apply in this case, the comment also buttresses the court's prior conclusion that the Act codified the common law rights of shareholders, leaving the rights of creditors untouched.

14

Ann. § 33-8-330(a) ("A director who votes for or assents to a distribution made in violation of Section 33-6-400 or the articles of incorporation is personally liable to the corporation . . . .).[7]

> ### a. Shareholder Derivative Suits as a Means to Vindicate the Rights of an Insolvent Corporation

The liability of directors for a loss to a corporation because of their mismanagement or breach of fiduciary duties is an asset of the corporation and any recovery on such a cause of action belongs to the corporation. *Johnson v. Baldwin*, 69 S.E.2d 585, 588 (S.C. 1952). Shareholders may assert the rights of the corporation against corporate directors in a derivative action under South Carolina law.  S.C. Code Ann. § 33-7-400; S.C. R. Civ. P. 23.   "The stockholder in an action of this kind [i.e., a derivative action] is only a nominal plaintiff, the corporation being the real party in interest." *Johnson*, 69 S.E. at 588 (citation omitted).  The right of a stockholder to maintain a derivative action against the directors of a corporation inheres in and attaches to his ownership of its stock and does not exist apart from the ownership of stock. *Id.* at 589 (citation omitted).

Courts recognize that this right to bring a derivative suit on behalf of the corporation is based on a shareholder's status as the residual owner of the corporation. *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("It is well settled that directors owe fiduciary duties to the corporation. When a corporation is *solvent*, those duties may be enforced by its shareholders, who have standing to bring *derivative* actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value.  When a corporation is *insolvent*, however, its creditors take the

---

[7] The court notes that PCS has not sued the Ross Directors for a distribution in violation of section 33-6-400, but, instead, asserted a common law breach of fiduciary duty claim.

place of the shareholders as the residual beneficiaries of any increase in value.") (emphasis in the original). When, as described in section 33-6-400, a director authorizes a distribution, which "after giving it effect" renders the corporation insolvent, a director has voted to wipe out shareholders' ownership interests in the corporation.  Through a derivative suit, a shareholder can reverse the distribution and return the distributed assets to the corporation, making the corporation again solvent and restoring the shareholders' residual ownership interests in the corporation.

What is at issue in this case, however, are not distributions *rendering* Ross insolvent, distributions prohibited by section 33-6-400 and remediable by a shareholder derivative action to enforce the right codified in that section.  Rather, PCS alleged that the challenged distributions were made when Ross was *already* insolvent.  ECF No. 34 at 19 ¶¶ 87-89 (Amended Complaint) ("In the 1990's Ross became insolvent . . . .  Instead of fulfilling their fiduciary duties [to creditors], the Ross Directors continued to distribute the proceeds of land sales to the Ross shareholders."). Section 33-6-400 is, by its own terms, silent about distributions made *during insolvency*, as opposed to those made during solvency which render the corporation insolvent.

Any reading of section 33-6-400 to include distributions made while a corporation is *already* insolvent would render the statute's remedial scheme in section 33-8-330 impossible. Section 33-8-330 makes directors liable *to the corporation* for violations of § 33-6-400.  As noted above, shareholders of an insolvent corporation have no residual ownership interest in the corporation. Their interest passes to the creditors of the corporation upon insolvency.  Absent a residual ownership interest, a shareholder thus lacks any economic incentive to bring a derivative suit seeking the return of a distribution made post-insolvency.  This is so because the

*shareholder* suffers no injury by receiving a distribution after insolvency; reversal of a distribution made after insolvency confers no benefit on the shareholder.

Under this reasoning it is possible as a conceptual matter that a shareholder can no longer assert the rights of the corporation after insolvency in a derivative suit because the basis of a shareholder's standing to do so, his or her residual ownership of the corporation created by virtue of his or her status as a stockholder, is extinguished; however, South Carolina courts appear to permit derivative suits by shareholders of insolvent corporations. *See Gary v. Matthews*, 145 S.E. 702, 703 (S.C. 1928) ("It is true that if the corporation, *or its receiver*, refuses to bring the action, one or more of the *stockholders*, depositors, or other creditors may then bring the action, but it must be brought in the right of the corporation, and for the benefit of all those entitled to participate in the distribution of the assets.") (emphasis added).  However, in this case, there is no practical reason why any of the Ross Shareholders would challenge the decision of the Ross Directors to distribute money—because the shareholders received the corporate assets.

Finally, former shareholders have no standing to bring a derivative suit.  *Davis v. Hamm*, 387 S.E.2d 676, 680-81 (S.C. Ct. App. 1989).  Thus, after dissolution of Ross in 2006, the Ross Shareholders, even had they economic reason to do so, would have been prohibited from asserting Ross's rights vis-à-vis the Ross Directors in a derivative action.  In sum, a derivative action by shareholders provides no workable remedy in this case for the damage done the corporation.

### b. Creditor Derivative Suits as a Means to Vindicate the Rights of an Insolvent Corporation

If a shareholder would not (or cannot) assert in a derivative action the section 33-8-330 rights of an insolvent corporation for the return of distributions made after insolvency, the question becomes whether creditors can do so. In its 2010 order on Ross's motion to dismiss and on PCS's motion to amend its complaint to add a derivative claim, the court denied the motion to amend as futile, holding that South Carolina did not recognize derivative suits by creditors. *PCS Nitrogen, Inc. v. Ross Dev. Corp. et al.*, C/A No. 2:09-3171, 2010 WL 3893619 at *14-15 (D.S.C. Sept. 30, 2010) (ECF No. 30) (Order on Motion to Dismiss in this case) (concluding that S.C. R. Civ. P. 23 confines the right to bring derivative suits to shareholders and only shareholders by its plain language). The court concluded that the right to bring a derivative action was status-based and the only status mentioned in South Carolina cases or Rule 23 was that of shareholder. *Id.* (citing *Johnson*, 69 S.E.2d at 589, and *Davis*, 387 S.E.2d at 678).

This conclusion was in error. As noted above, the underlying reason for permitting shareholders to bring derivative suits applies to creditors once the corporation is insolvent. *See Gheewalla*, 930 A.2d at 101-103 (Del. 2007) (concluding that creditors lack a direct claim for breach of fiduciary duty against the directors of an insolvent corporation but may assert such a claim on behalf of the corporation itself in a derivative suit). South Carolina has long recognized the right of creditors to bring derivative actions on behalf of insolvent corporations. In *Browne v. Hammett*, the South Carolina Supreme Court considered an action brought by creditors of a defunct bank against the directors of the bank for their alleged mismanagement of the bank. 131 S.E. 612, 613 (S.C. 1926). The action "sought to realize, to the corporation, assets for distribution among the depositors and general creditors first, and to the stockholders, should a

balance remain." *Id.* The South Carolina Supreme Court held:

> The rule regulating actions by the creditors in the right of the corporation is the same as that applied to actions by stockholders. After insolvency and on refusal of the corporation to act, creditors may sue in the right and on behalf of the corporation to enforce its cause of action against officers or directors who are guilty of misfeasance or malfeasance.

*Id.* at 615 (internal quotations and citation omitted).

The Supreme Court permitted the derivative suit by creditors to proceed. *Id.* The right of creditors to being derivative actions was affirmed two years later: "It is true that if the corporation, or its receiver, refuses to bring the action, one or more of the stockholders, depositors, or other creditors may then bring the action, but it must be brought in the right of the corporation, and for the benefit of all those entitled to participate in the distribution of the assets. It cannot be maintained by one class of creditors solely for their benefit." *Gary*, 145 S.E. at 703; *see also Daniels v. Berry*, 146 S.E. 420, 421 (S.C. 1929) ("A violation of that [fiduciary] duty would constitute negligence, and the bank, or its receiver when one has been appointed, or the creditors if the receiver should refuse to sue, may bring an action for the benefit of the bank against the directors for such negligence."); *see also* Gregory B. Adams et al., *South Carolina Corporate Practice Manual* 518 (2d ed. 2007) ("[C]reditors may assert claims that officers and directors have violated their fiduciary duties to the corporation and are liable to it. These may be asserted in a derivative action brought by the creditors . . . .").[8]  This result is in accord with the compelling policy reasons justifying the existence of such a right as articulated by the Delaware

---

[8] The *Manual* also observes that "Rule 23(b)(1) of the South Carolina Rules of Civil Procedure regulates derivative suits brought by shareholders but not those brought by creditors, which remain purely judicially sanctioned actions of equity heritage." Gregory B. Adams et al., *South Carolina Corporate Practice Manual* 518 n.41 (2d ed. 2007)

Supreme Court in *Gheewalla*. 930 A.2d at 101-103.[9] The court makes clear in this order, notwithstanding its analysis five years ago, that creditors may bring derivative suits under South Carolina law.

Although acknowledging its error, the court considers itself bound by its 2010 order because that order is the law of the case. A previous decision of a court becomes law of the case and must be followed unless "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) (internal quotations and citations omitted). The first two exceptions to the doctrine have no application here. With respect to the third, although the court's earlier decision may have been clearly erroneous, abiding by it would not work "manifest injustice" in this case because, as detailed below, PCS will receive complete recovery on its fraudulent conveyance claim.

---

[9] In materials published at the direction of the General Assembly after the 1963 revisions of the Business Corporation Act, the South Carolina Reporter made clear that the Act made no substantive changes to the law surrounding derivative suits in South Carolina and further observed that "in this State creditors also have standing to maintain derivative actions in the right of the corporation." J. Comm. of the Gen. Assemb. to Investigate the Feasibility of Revising the Laws of This State Relating to Corp. and Sec. & The Jud. Council of S.C., *South Carolina Business Corporations Act Annotated Edition*, App'x I, "Note on Shareholder Derivative Suits," 215, 217 (Ernest L. Folk, III, Rep., 1964) (citing *Browne v. Hammett*, 131 S.E. 164 (S.C. 1929)). The demand requirement is waived post-insolvency. *Id*. The Business Corporation Act of 1962  contained provisions substantially similar and, in some cases, identical to, §§ 3-6-400, 3-8-300, and 3-8-330 of the 1988 Act currently in force. *Compare* Business Corporation Act of 1962, §§ 12-15.16, 12-18.15, and 12-18.16, 1963 S.C. Acts 327 (1963) *with* Business Corporation Act of 1988, S.C. Code Ann. §§ 33-6-400, 33-8-300, and 33-8-330.

<u>c. Conclusion Regarding Sections 33-8-330 and 33-6-400</u>

If sections 33-8-330 and 33-6-400 are to be construed as urged by the Ross Directors, only one avenue of relief is available to reverse distributions made post-insolvency: the insolvent corporation must itself assert its rights.  Practically, of course, that entails the corporate directors voting to sue *themselves* to seek the return of monies properly belonging to creditors after having previously voted to distribute the same monies to, in this case, themselves and their families. Further, in this case Ross was dissolved by the end of 2006 and a dissolved corporation likely does not itself have sufficient standing to bring a claim.

The court concludes that the statutory schema of section 33-6-400 and 33-8-330 provides the remedies available to *shareholders* when a director votes for a distribution *rendering* the corporation insolvent.  These two provisions of the Act have no application to shareholder distributions made after a corporation is already insolvent or to claims brought by creditors and do not, therefore, govern or restrict PCS's common law breach of fiduciary duty claim in this case.

**3. Section 33-14-107 Does Not Provide "the Exclusive Remedy" for the Claim Asserted by PCS against the Ross Directors Because Section 33-14-107 Applies Only to Claims Brought against the Dissolved Corporation Itself**

The final statutory argument grounded in the Act made by the Ross Directors is that section 33-14-107 provides "the exclusive remedy under these circumstances" where a dissolved corporation is sued for unknown future claims.  ECF No. 351 at 33-35.  If secton 33-14-107 does, indeed, provide such an exclusive remedy, then PCS would have no common law breach of fiduciary duty claim.

Section 33-14-107, titled "Unknown claims against dissolved corporation," provides that,

where a dissolved corporation provides newspaper notice of its dissolution, "a claimant whose claim is contingent or based on an event occurring after the effective date of the dissolution" is "barred unless the claimant commences a proceeding to enforce the claim against the dissolved corporation within ten years after the publication date of the newspaper notice . . . ." S.C. Code Ann. § 33-14-107.  The section further provides that:

> (d) A claim may be enforced under this section:
>
> > (1) against the dissolved corporation to the extent of its undistributed assets; or
> >
> > (2) if the assets have been distributed in liquidation, against a shareholder of the dissolved corporation to the extent of his pro rata share of the claim or the corporate assets distributed to him in liquidation, whichever is less, but a shareholder's total liability for all claims under this section may not exceed the total amount of assets distributed to him.

*Id*.

Two problems are immediately evident with the Ross Directors' approach.  First, section 3-14-107 does not create a cause of action itself, i.e., it creates no rights.  The "claim" referred to in the section is one existing independently of the Act, e.g., for personal injury, breach of contract, etc.  *See* S.C. Code Ann. § 3-14-107 Official Comment (observing that "most of" the post-dissolution claims contemplated by the provision were "based on personal injuries").  The statute creates no rights and commands no "exclusive remedies" altering the preexisting remedies available for whatever species of claim may be brought against the dissolved corporation.  Second, the statute is plainly limited to "claims against [a] dissolved corporation." S.C. Code Ann. § 33-14-107.  PCS's breach of fiduciary duty claim is not against the dissolved corporation but, instead, against the corporation's former directors.

22

The court declines to find that a statute purporting to limit claims against a dissolved corporation primarily by establishing a limitations period also limits claims against the directors of that corporation for their—and not the corporation's—torts, i.e. breach of fiduciary duty.

### 4. Breach of Fiduciary Duty Claims against Directors of Insolvent Corporations Are Available to Unknown or Contingent or Future Creditors

The crux of the allegations against the Ross Directors is that they breached their fiduciary duties to a future, contingent creditor—PCS—by distributing all of Ross's assets rather than setting aside a sum to cover the corporation's potential liabilities.   The Ross Directors argue that a cause of action for breach of fiduciary duty is available only to known or current creditors as "[t]here is no reported legal precedent from the appellate courts of South Carolina holding a director of a corporation owes a common law fiduciary duty to an unknown future contingent creditor at the time of authorization of a distribution."   ECF No. 351 at 22.  This reading draws an arbitrary line, protecting tortious directors from liability for unknown or contingent claims where analogous provisions of the law specifically protect the claims of unknown or contingent creditors.  Although most relevant to a claim against a corporation itself, South Carolina's dissolution statute specifically contemplates that unknown or contingent claims will survive the dissolution of a corporation and may be brought against it for a period of up to ten years.  S.C. Code Ann. § 33-1-400.  In addition, in the federal bankruptcy context, a claim against a corporation in bankruptcy proceedings includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  Thus the policy articulated by statutes, in both the dissolution and insolvency contexts, is to protect future, unknown, or contingent creditors of dissolving or insolvent corporations.  *See also* 19 Am. Jur.

23

2d Corporations § 2453 ("Although it is not necessary for a corporation to satisfy its contingent liabilities upon dissolution, a corporation is required to make provision for the discharge of such liabilities before distributing its remaining assets to its shareholders. A creditor whose claim is contingent is entitled to the same consideration and protection as a creditor whose claim is certain.").  The general rule is clear: corporations are not permitted to ignore potential claims by unknown or future creditors.  A corollary is that directors of an insolvent corporation owe the same fiduciary duties to unknown future creditors as they do current, known creditors.

The record at trial supports a finding that the Ross Directors understood their responsibilities to unknown, future creditors.  During the liquidation of the company that started in 1982, the Ross Directors typically authorized distributions after the sale of each property if there were excess funds, keeping in reserve amounts to pay taxes, other expenses, and any unknown future liabilities.  Ross "tried to keep a minimum of $200,000.00 in the accounts just in case something came up that we didn't know about." Trial Tr. 106:9-15.  Minutes from a special board meeting held December 4, 1986, state that $200,000.00 was the amount "previously set by the Directors as an optimum amount, to retain by the Company for known or unknown contingencies." Defs.' Ex. 57 at 120.   At that meeting, the board further discussed "the continued advisability of retaining approximately $200,000 in funds of the Company to meet expenses and other contingencies of the Company during the process of liquidation of the assets of the Company."  Defs.' Ex. 57 at 120.  Hanahan observed at trial that it was "common sensical" that creditors "included anyone who might have a claim against Ross[.]"  Trial Tr. 987:24-988:2.

Because a fiduciary duty is owed future, unknown, or contingent creditors when a corporation becomes insolvent, PCS may proceed against the Ross Directors on a claim of breach of fiduciary duty.[10]

### 5. Creditors May Bring Direct Actions against Directors of Insolvent Corporations for Breach of Fiduciary Duty

Next, the Ross Directors argue that, even if they owed a common law fiduciary duty to a creditor such as PCS, the law of South Carolina does not permit a direct claim for redress of a breach of that duty. ECF No. 351 at 21-13. South Carolina courts have recognized direct actions by creditors against corporate directors of insolvent corporations. *See Stewart*, 149 S.E. at 165 (permitting a creditor to proceed on a claim of breach of trust against directors of a failed bank, holding: "if the mismanagement of the directors has caused a loss *to the corporation*, and not to any particular general creditor, depositor, or stockholder, the liability of the directors on account thereof is an *asset of the corporation*, remediable only by an action in the name or in the right (under the appropriate circumstances) of the corporation; if the mismanagement of the directors has caused a particular loss to an individual general creditor, depositor, or stockholder, the liability is an asset of such injured individual, remediable by an action in his name") (emphasis in the original); *Steel Techs., LLC, v. The Triple E Corp.*, No. 01-CP-40-5222, 2004

---

[10] The Ross Directors also note that they "had **no** knowledge of the identity of the alleged future contingent creditor," "**no** existing obligation to that unknown creditor," and "**no** knowledge that Ross was hypothetically insolvent." ECF No. 351 at 23 (emphasis in the original). This lack of actual knowledge is beside the point. Had the Ross Directors investigated their liability for the Site, explored who may have a claim against them, or made appropriate provision for remediation based on some reasonable estimate, the directors would not have breached any fiduciary duty. It cannot seriously be contended that a lack of actual knowledge occasioned by a failure to carry out the fiduciary duties owed creditors is a defense to a creditor's breach of fiduciary duty claim.

WL 5000213 at *4-5 (S.C. Ct. Com. Pl. 2004) (awarding judgment to an individual creditor against directors individually, jointly, and severally for breach of fiduciary duties).  The court concludes that South Carolina law recognizes a direct cause of action by a creditor against directors of an insolvent corporation for breach of fiduciary duties owed that creditor.

### 6. Scope of Direct Claims Against Directors for Breach of Fiduciary Duties

The scope of such direct claims is, however, narrow.  As the South Carolina Supreme Court made clear in *Stewart*, in order for a creditor to possess a direct claim, the creditor must have suffered some particularized harm at the hands of the breaching directors.  *Stewart*, 149 S.E. at 165.  The South Carolina Supreme Court also has noted that courts must be careful to "distinguish clearly" between rights accruing to the corporation itself versus those accruing to creditors personally.  *Daniels*, 146 S.E. at 421.  In *Daniels*, depositors of a failed bank sued the directors of that bank for negligently allowing deposits of money in an insolvent bank after the directors knew or should have known by the exercise of due care that the bank was insolvent. The South Carolina Supreme Court held that, absent a showing that the deposit was "induced by fraud or deceit," a creditor, i.e. a depositor, could not personally recover against directors for negligent mismanagement.  *Id*.  The Supreme Court took care to note that a depositor's remedy in such a case was a derivative action on behalf of the corporation.  *Id*.

The Ross Directors urge the court to hold that a showing of fraud or deceit is an essential element of a direct common law breach of fiduciary duty claim against corporate directors.  ECF No. 351 at 36.  Although *Daniels* stands for the proposition that the universe of direct claims available to creditors is narrower than those available derivatively, the South Carolina Supreme Court limited its holding to the particular circumstances of bank directors and depositors, noting

26

specifically that to hold bank directors personally liable to depositors "would place on them a burden not contemplated by the banking laws and not accordant with the banking usages and customs of the state." *Id.* at 424. Thus, *Daniels* is distinguishable.

The more modern trend among courts is to allow a creditor to recover where a director has engaged in self-dealing. One commentator who undertook a survey of cases concluded that:

> All of the decisions in which the courts have allowed creditors to recover for breach of fiduciary duty have involved directors of an insolvent corporation diverting corporate assets for the benefit of insiders or preferred creditors. These cases fall into five general categories: (1) withdrawing assets from the insolvent corporation as alleged payment of claims that the directors had against the corporation, such as loans to the company or unpaid commissions; (2) using corporate funds to pay off the company's loans that the directors had personally guaranteed; (3) engaging in transactions, usually without fair consideration to the company, for the benefit of its parent corporation or related entities; (4) pocketing the proceeds of a sale of all corporate assets to a third party or otherwise transferring property to a related entity, leaving the former corporation insolvent; and (5) other forms of self-dealing in which the directors use assets of the insolvent firm for their own benefit, such as pledging stock owned by the corporation as collateral to finance the directors' personal stock purchases.

Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors*, 46 Vand. L. Rev. 1485, 1513-14 (1993). A "common theme" is "the resemblance to fraudulent conveyances or voidable preferences under bankruptcy law." *Id.* at 1514. The court concludes that directors may be directly liable to creditors, even in the absence of fraud or deceit, to the extent they engage in self-dealing by preferring themselves over creditors "by transfer of property or payment of cash." *See Cumberland Wood Prods. v. Bennett*, 417 S.E.2d 617, 619 (S.C. Ct. App. 1992).[11]

---

[11] "A conflict of interest transaction [constituting self-dealing] does not include transactions in which the director participates in the transaction only as a

27

Although PCS is correct that a direct cause of action exists, PCS has not shown that PCS itself is entitled to bring such a claim. The cases PCS cites as supporting its right to bring a direct claim—although establishing that such direct claims are theoretically available—are distinguishable on their facts from the case at bar and do not support PCS's contention that it has such a direct claim. In particular, the most on point cases contain elements of fraud, misrepresentation, or self-dealing not present in this case. In *Cumberland Wood Products*, the South Carolina Court of Appeals affirmed a judgment on a direct claim by a creditor against a corporate director for breach of fiduciary duty where the defendant director was one of two directors, along with his wife, and continued to draw a salary from the insolvent corporation "determined by his needs at home." *Cumberland Wood Prods.*, 417 S.E. at 272. The director also issued the plaintiff creditor bad checks to cover the debt. *Id.* The issuance of bad checks to the specific plaintiff in that case introduced an element of misrepresentation and caused the plaintiff sufficiently particularized harm to warrant availability of a direct claim. In another South Carolina case permitting a creditor a direct claim, *Steel Techs., LLC v. The Triple E Corp.*, the South Carolina Court of Common Pleas held two directors personally liable on a creditor's direct claim for breach of fiduciary duty where the directors' actions "rid [the two directors] from liability on their personal guarantees on [a note]," a classic example of impermissible self-dealing. *Steel Techs., LLC*, 2004 WL 5000213 at *3. The court in that case went on to find clear evidence of a "scheme to defraud . . . creditors including Plaintiff." *Id.* The evidence in this case does not support an analogous finding that the Ross Directors inflicted a sufficiently particularized injury on PCS.

---

shareholder and receives only a proportionate share of the advantage or benefit of the transaction." S.C. Code Ann. § 33-8-310 (Official Comment 1).

28

Unlike the plaintiffs in *Carolina Wood Products* and *Steel Technologies*, PCS has not established that it suffered a particularized harm sufficient to entitle it to a direct claim. Ross's liability for the Site under CERCLA may extend to entities engaged in remediation other than PCS. For example, in the 2006 CERCLA litigation, Ross's liability was likely to have been to Ashley II. Currently, it is likely Ross's liability is to PCS. It is possible that other parties, such as Holcomb and Fair or the EPA, may also be owed money for portions of their response costs at the Site. In other words, the Ross Directors' improper distributions harmed *all* creditors equally, not simply PCS. Thus, awarding damages to PCS for PCS's sole benefit does not remedy the Directors' beach of duty, which was a breach of duty owed to the corporation and which was remediable by a derivative action designed to restore assets to the corporation for the benefit of *all* of the corporation's creditors. Absent some particular contract with or representation to PCS, or some example of self-dealing beyond mere *pro rata* receipt of distributions, PCS cannot assert a direct claim for breach of fiduciary duty against the Ross Directors. The court. therefore, **grants** judgment as a matter of law notwithstanding the verdict to the Ross Directors.[12]

---

[12] Because the Ross Directors have prevailed on their motion for judgment as a matter of law notwithstanding the verdict on the basis that PCS does not have available to it the type of claim it asserted, the court need not reach the Ross Directors' arguments relating to the statute of limitations applicable to PCS's breach of fiduciary duty claim, the timing of PCS's collection on the judgment, the business judgment rule, and the sufficiency of PCS's proof as to Ross's insolvency, PCS's creditor status, and PCS's damages.

### III. The Ross Shareholders' Motion for Reconsideration and to Alter or Amend

#### A. Legal Standard for Motions to Alter or Amend Pursuant to Rules 52(b) and 59(e)

Federal Rule of Civil Procedure 52 provides: "In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "A party may later question the sufficiency of the evidence supporting the findings. . . ." Fed. R. Civ. P. 52(a)(5). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(1)(6). "[T]he court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). A motion pursuant to Rule 52 may be made in conjunction with a motion to alter or amend a judgment pursuant to Rule 59(e). *See* Fed. R. Civ. P. 52(b) & 59(e).

Rule 59 motions must not "be made lightly" because "[r]econsideration of a previous order is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Crossman Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.*, No. Civ. A. 4:09-1379, 2014 WL 108316 at *1 (D.S.C. Jan 8. 2014) (quoting *Nelson v. Sam's Club,* No. 4:10–3020–RBH, 2011 WL 2559548 at *1 (D.S.C. June 28, 2012) (quoting 12 James Wm. Moore et al., *Moore's Federal Practice* ¶ 59.30[4] (3d ed.))); *see also Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998) ("In general, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."). The court may grant relief under Rule 59(e): "(1) to accommodate an intervening change in controlling

law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.,* 148 F.3d at 403.

A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "Manifest injustice occurs where the court 'has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension . . . .'" *Quinton v. Toyota Motor Corp.*, No. CIV. A. 1:10-02187, 2014 WL 526332 at *2 (D.S.C. Feb. 7, 2014) (quoting *Campero USA Corp. v. ADS Foodservice, LLC*, 916 F. Supp. 2d 1284, 1292–93 (S.D. Fla. 2012)).

A party moving pursuant to Rule 59 must demonstrate more than "mere disagreement" with the court's order to succeed on a Rule 59(e) motion. *Hutchinson v. Staton,* 994 F.2d 1076, 1082 (4th Cir. 1993). A Rule 59(e) motion is not a proper forum to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2810.1 (3d ed.).[13]

---

[13] The standard for motions pursuant to Rule 59(e) also applies to motions brought pursuant to Rule 52. *See Ridgeway v. Stevenson*, Civ. A. No. 3:10-490, 2011 WL 1466325 at *1 n.1 (D.S.C. Apr. 15, 2011) ("[I]t appears that [the] standard under Rule 52 is identical to the requisite standard under Rule 59(d)") (citing *Wahler v. Countrywide Home Loans, Inc.*, No. 1:05CV349, 2006 WL 3327074, at *1 (W.D.N.C. Nov. 15, 2006)).

### B. The Ross Shareholders' Thirteen Challenges to the Court's Findings of Fact

The Ross Shareholders seek amendment or deletion of thirteen of this court's factual findings on the ground that they are clearly erroneous. The court reviews each of the thirteen below.

### 1. Paragraph 6: In 2005, the EPA estimated that the total remedy costs would be roughly $7.882 million. Trial Tr. 304:10-16.

The Ross Shareholders argue that "this finding is not relevant to the fraudulent conveyance claim" because there was no proof that any of the directors or shareholders knew of the EPA's 2005 fact sheet at the time the distributions were made, and, thus, the fact sheet cannot be any evidence of "intent" to defraud creditors. ECF No. 352 at 7. PCS notes the Ross Shareholders do not contest the accuracy of this finding and that "irrelevance" is hardly synonymous with "clearly erroneous." The court declines to change this finding of fact. The EPA Fact Sheet is included in the Findings of Fact for two reasons: first, it goes to the existence of a debt owed by Ross, in the form of environmental liability, and, second, it is some evidence of the amount of the debt that would be owed by Ross to remediate the Site. Nothing is inaccurate about this statement summarizing a piece of admitted evidence and, therefore, the finding of fact is not clearly erroneous.

### 2. Paragraph 9: During the trial of the Ashley matter, two of the Ross Directors, Rike and Carter, presented testimony on Ross's liquidation. Based on that testimony, the court found that "[t]he evidence suggest[ed] that the Ross Directors knew that Ross might be liable for contamination at the Site and took action to make the company judgment proof." Ashley II, ECF No. 627 at 94.

The Ross Shareholders argue that this quotation from *Ashley II* should not be a finding of fact in the present case because the court made clear in the post-trial motions from the earlier case that the statement was not intended to be a finding of fact. The Ross Shareholders contend

32

the statement is being treated with the preclusive effect of collateral estoppel.  ECF No. 352 at 8-9.  PCS opposes any change, noting that it is not clear that the statement has any preclusive effect and that the statement does not detract from the remainder of the court's decision.  ECF No. 363 at 27.  The court did not consider itself bound by that prior statement, but merely provided it as pertinent, accurate background information.  In order to remove any ambiguity, however, the court will delete this finding of fact.

> **3. Paragraph 12: Through its fraudulent conveyance claim, PCS seeks to recover funds that can be used to pay response costs. Specifically, PCS seeks to void distributions made by the Ross Directors to the Ross Shareholders during the period of 1998 to 2006.**

The Ross Shareholders argue that this finding does not "correctly state what PCS sought to recover in this action and should be amended to be consistent with PCS's pleading."  ECF No. 352 at 9.  The Shareholders point out that in the complaint PCS only claimed as damages its legal fees and "the difference between any judgment entered against Ross in favor of PCS in the Ashley litigation and Ross assets available to satisfy the judgment."  *Id*. at 10.  PCS replies that "it is palpably clear that PCS is trying to recover funds to pay . . . Ross's liability for response costs."  ECF No. 363 at 28. Further, PCS argues that the complaint as a whole gives rise to the inference that PCS is seeking response costs because PCS alleged that it has filed a CERCLA contribution claim against Ross, that the remediation could cost up to $10 million, and that Ross cannot pay any liability to PCS arising under CERCLA.  *Id*.  The court considers the object of this action to be clear: to identify assets that can be used to pay Ross's share of the remediation costs at the Site. This finding is not clearly erroneous because the weight of the evidence supports a finding that this case is about Ross's inability to pay its response costs at the Site. Amendment of this finding is denied.

33

**4. Paragraph 13: Ross was founded by J. Ross Hanahan and was for the duration of its existence a closely held family corporation.**

The Ross Shareholders argue that the court's use of the words "closely held" to characterize Ross is clearly erroneous. They argue that the South Carolina Close Corporation Act, S.C. Code Ann. §§ 33-18-101 *et seq.*, describes the attributes of the close corporation and Ross does not fit those attributes.  For example, close corporations usually have a fifty shareholder limit and abandon certain corporate formalities.  As the court found in its Findings of Fact, the evidence in this case shows Ross observed appropriate corporate formalities and had more than fifty shareholders. The Ross Shareholders propose that the finding be amended to read "Ross was founded by J. Ross Hanahan, and for the last 20 years of its existence, the board of directors abided by all corporate formalities, required annual audits, and did not show any favoritism among its approximately seventy shareholders."

The court will amend this finding to be clear that it is not making a finding that Ross is a close corporation pursuant to the S.C. Close Corporation Act. The amendment proposed by the Ross Shareholders is, however, not appropriate.  This finding will be amended to read as follows: "Ross was founded by J. Ross Hanahan and was for the duration of its existence a privately-held corporation. Ross's shares did not trade publically."

**5. The characterization by the court of the shareholders as "family" in Paragraphs 14, 16, 18, and 19.**

Ross argues, as it did repeatedly in its prior briefing, that the Ross Shareholders are not family "for most purposes under South Carolina law" because "family" means "immediate family."  In making its findings, the court used "family" in a common sense of the word meaning: "A group of persons sharing common ancestry," The American Heritage College

34

Dictionary (3d ed. 2000); "any group of people connected by blood, marriage, adoption, etc.," Oxford English Dictionary (3d ed. 2013); or "A group of persons connected by blood, by affinity, or by law," Black's Law Dictionary (10th ed. 2014). The court will not amend its findings characterizing the Ross Shareholders as family because the conclusion is not clearly erroneous and finds ample support in the record.

There are sub-parts to the Ross Shareholders' objections on this point.

1.   They object to the statement that "the Hanahan family controlled the Ross board of directors" because Buist Rivers was not a family member. The court finds this objection to be without merit. Even ignoring the testimony that he was like an "uncle" to the family, Trial Tr. 1008:2, one non-family director on a board of five does not cost the family control of the board where family members hold the other four board seats.

2.   They object to the statement that "each director represented the lineal descendants of the children of J. Ross Hanahan" because Buist Rivers was not related to any of the Hanahans. The court finds this objection to have merit. The court therefore amends this finding to ensure accuracy. The amended finding shall read: "With the exception of Buist Rivers, each director represented the lineal descendants of the children of J. Ross Hanahan. Trial Tr. 739:19-21. "

3.   They object to the statement that the Ross shareholders were "also mostly Hanahan family members" because "a significant number, approaching half, appear not to be related by blood or marriage." The court finds this objection to be without merit. "Approaching half" means "less than half" which means, by definition, that more than half, or most, of the shareholders were in fact "related by blood or marriage."

With the exceptions noted above, the court declines to amend its findings characterizing the Ross Shareholders as family.

***6. Paragraph 44: In 1992, the board first learned that the property where Ross had formerly manufactured fertilizer might be contaminated. At the time, Ross had been in dissolution for ten years and was in the process of liquidating Ross's real property holdings.***

The Ross Shareholders argue that this finding is incorrect because "it implies that the Ross board learned in 1992 that the former fertilizer operations may have contaminated the property." Ross proposes the following formulation: "In 1992, the board first learned that the adjoining Koppers property was contaminated with creosote and that it was possible some of the creosote migrated to the property where Ross had formerly manufactured fertilizer." The court hereby amends this finding per Ross's proposal in order to remove ambiguity as to the relationship between creosote contamination from Koppers and the different contamination associated with fertilizer manufacturing.

***7. Paragraph 49: Bouch warned Rivers that there might be creosote contamination of the Planters property . . . . Given that the Planters property was situated to the north of Milford Street, Bouch expressed his concern that the Planters Site also might be contaminated.***

Ross objects to the use of the words "warned" and "expressed his concern," proposing instead that the court find that Bouch merely "informed" Rivers about the possibility of contamination. ECF No. 352 at 18-19. PCS replies that the fact that Bouch may not have "uttered the words 'warn' and 'concern' does not diminish the fact that he 'warned' Mr. Rivers that creosote may have migrated onto the Planters property, and that this was, or should have been, a matter of 'concern.'" ECF No. 363 at 32. PCS argues that the evidence supports the court's conclusion that Bouch's statements should have been taking as a warning because of the serious problems the contamination was causing Bouch's own client and other context surrounding the conversation between Rivers and Bouch. The court hereby accepts Ross's

proposal and amends this finding to replace te words "warn" and "expressed his concern" with the words "informed" and "informed Rivers."

### 8. Paragraph 58: The corporation did nothing to address Ross's potential liability in light of these two articles.

The Ross Shareholders take issue with both parts of this finding of fact, arguing that the record does not support a finding that Ross had "potential liability" for the creosote contamination nor does the record support a finding that the Directors "did nothing."  With respect to the former, the Ross Shareholders contend that there was "no proof that in fact creosote had migrated to the former Planter's property" and that there was no finding in the *Ashley II* case that creosote was a major contaminant at the Site.  ECF No. 352 at 20.  The Ross Shareholders further argue the Directors did do "something," namely, Rivers spoke to Bouch and then the directors talked amongst themselves.  The court amends this finding to read as follows: "After the conversation between Rivers and Bouch, the board made no further inquiries about either the Koppers Site or potential contamination at the Planters property.  Trial Tr. 215:17-216:4.  Ross did not take any steps to determine whether creosote had, in fact, flowed onto the former Planters property.  Trial Tr. 91:22-92:1.  Ross did not retain an environmental attorney.  Trial Tr. 87:16-19.  Ross did not seek advice regarding the environmental laws or its potential liability under them.  Trial Tr. 91:13-19. "

**9. Paragraph 59: Scarborough, who was the board president at the time, never informed Ross's accountant, Daniell, of the company's potential liability for the Site. Trial Tr. 386:3-5, 403:10-12. The special meeting notice, which referenced a potential environmental liability claim, was not provided to Ross's accountant, and the accountant was not otherwise informed of the potential claim. Trial Tr. 452:6-14.**

The Ross Shareholders again argue that the formulation "potential environmental claim" is erroneous because Ross was never held liable or sued by anyone for contamination related to creosote. As before, the court found that the board's own minutes and the director's own conversations reflected their concern about "potential environmental liability" at the Site related to the Koppers litigation. *See* Findings of Fact and Conclusions of Law, ¶¶ 51, 54, 54, 57. PCS observes: "The only expert who testified in the case opined that Ross's dissolution plan and basic accounting principles obligated the board to inform its accountant of the [potential] liability, and Ross's accountant agreed. Trial Tr. 431:18-432:6; 442:20-443:1; 532:20-533:19; 539:5-540:8; 543:4-19; 570:23-5:71-4)." ECF No. 363 at 35. The court concludes that the Ross Shareholders have not shown this finding of fact to be clearly erroneous it will not, therefore, be amended.

**10. Paragraph 70: Hagood did not offer Scarborough any assurance that a private party would not seek to recover response costs from Ross in private party litigation. Trial Tr. 776:5-9, 397:15-16, 20.**

The Ross Shareholders ask that this finding be deleted in its entirety because it "is unsupported in the absence of any proof that the topic of litigation by private parties was disused or that Scarborough sought any such assurances." ECF No. 352 at 22. PCS places the finding in the context of others starting with Paragraph 64 that discuss why Scarborough did not obtain "an opinion on Ross's liability" when he spoke to his friend Hagood. "The court precisely describes the scope of the conversation between Mr. Hagood and Mr. Scarborough—both what they

38

discussed and what they failed to discuss." ECF No. 363 at 36.  Because the record does not

reveal that private party litigation was, in fact, a topic of conversation between Hagood and

Scarborough, the court will delete this finding of fact.

> ***11. Paragraph 78: However, in the months that followed, and without waiting to learn which Site owners the EPA would direct to pay for clean-up costs incurred at the Site, the board authorized two distributions to shareholders: $739,268.00 in March 1999 and $292,123.00 in June 1999. ECF No. 312 (Joint Stipulations). It was the only time, other than in 2006, that the board authorized distributions twice in a single year. Id. As a result of those distributions, the Ross bank accounts were depleted, as the funds were either distributed to shareholders or used to pay bills. Pl.'s Ex. 50.***

The Ross Shareholders argue that "the testimony and exhibits were undisputed that the

board's actions in 1999 were not linked to the telephone message, that the distributions were the

result of the significant closings that occurred in late [1998] and the first half of 1999, and that

Ross's bank accounts were not drained, but instead fortified."  ECF No 352 at 24.  Ross cites to

the trial transcript for the various portions where the directors state that they either (a) never

received the Rike message or (b) never discussed the message, much less took any action based

on it. *Id*. Further, Ross cites the bank statements for the proposition that the bank accounts were

not depleted because after the distribution over $840,000.00 was left in the bank accounts.  *Id*. at

27-28.

Ross proposes this amended finding of fact to replace Paragraph 78: "In the months that

followed, the board authorized two distributions to shareholders after several closings occurred:

$739,268.00 in March 1999 and $292,123.00 in June 1999. ECF No. 312 (Joint Stipulations).  At

the time of the distributions, the board withheld significant reserves to account for known

obligations and to keep at least $200,000 for unknown contingencies. Def.'s Ex. 57, p. 232, RDC

-292. From the end of fiscal year 1998 to the end of fiscal year 1999, the cash on hand increased

from $432[,]065 to $838,317. Pl.'s Ex. 108, RDC 0242. Ross did not deplete its bank accounts."

PCS's response is merely that the Ross Shareholders already made this argument in their proposed findings of fact and conclusions of law, and that "considering the entirety of the record evidence and the credibility of the witnesses, the Court disagreed with the [Ross Shareholders'] interpretation of the evidence. Dissatisfied with the judgment, the [Ross Shareholders] seek to re-litigate this issue. That is not a proper basis for a post-judgment motion." ECF No. 363 at 36-37.

Ross is correct that the company bank accounts contained a higher balance at the end of 1999 than at the beginning of 1998. The last sentence of the finding of fact at ¶ 78 of the original Findings of Fact and Conclusions of Law will therefore be amended by deletion. The court made the remainder of this finding after considering the testimony and exhibits and after assessing the credibility of the witnesses. The Ross Shareholders' disagreement with the court's conclusion is no ground for amendment. Amendment of the remainder of this finding is therefore denied.

> **12. Paragraph 88: As of July 12, 2006, Ross still retained approximately $700,000.00 in assets. Pl.'s Ex. 91. Instead of setting these funds aside until liability for the Site was resolved in Ashley's lawsuit, the board called a special meeting and authorized a "final liquidating distribution" to shareholders at $18.00 per share. Id.**

The Ross Shareholders argue that this finding is "inaccurate to the extent it suggests that the board discussed not making distributions until liability for the Site was resolved in Ashley's lawsuit." ECF No. 352 at 28. PCS contends "these exact arguments have already been considered and rejected by the Court." ECF No. 363 at 38. The record is clear that Ross did not set aside funds to cover its liability for the Site. The court will, however, amend this finding to read as follows: "As of July 12, 2006, Ross still retained approximately $700,000.00 in assets.

40

Pl.'s Ex. 91.  Ross did not set aside these funds until liability for the Site was resolved in *Ashley II*.  At a special meeting held on July 12, 2006, the board authorized a "final liquidating distribution" to shareholders at $18.00 a share.  *Id.*"

> **13. Paragraph 99: PCS moved for leave to bring claims against Ross in the Ashley litigation on November 30, 2006. Ashley II, ECF No. 46. The board learned of PCS's motion the same day. Trial Tr. 724:13-14, 129:20-22. The motion sought to recover response costs from Ross and set forth PCS's concern that the board might have dissolved Ross "with the intent to evade the liabilities associated with the [Site] operations described above."  Defs.' Ex. 26 at ¶8; Trial Tr. 1018:17-1019:5.**

The Ross Shareholders argue that this finding misstates what Ross alleged. Rather than "might have dissolved Ross with the intent to evade the liabilities," PCS's complaint alleged that the dissolution was with the specific intent to evade the liability.  ECF No. 352 at 29.  After a review of PCS's proposed amended complaint, the court will delete the words "might have" and amend this finding so that it reads: "The motion . . . set forth PCS's concern that the board dissolved Ross 'with the intent to evade the liabilities . . . .' "

### C.  The Ross Shareholders' Challenges to the Court's Conclusions of Law: Inappropriate Subjects for a Motion for Reconsideration

The Ross Shareholders offer fifteen objections to the various conclusions of law made by the court.  Many of them are rooted in arguments Ross made previously and are fully addressed in the Conclusions of Law.  A Rule 59(e) motion is not a proper forum to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *See* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2810.1 (3d ed.).  The following objections are attempts to "relitigate old matters" and are inappropriate subjects for the instant motion for reconsideration:

- That PCS was not a creditor or potential subsequent creditor of Ross until September 2005 at the earliest.  ECF No. 353 at 31.  The court addressed this at

page 35 of its Conclusions of Law.  The issue and the record support for the
determination are also fully explored earlier in this order.

- "That PCS failed to prove the amount of the debt owed by Ross to PCS for
  contribution for what PCS may pay in excess of its share of the 30% of the total
  response costs incurred to clean up the Site that PCS is unable to collect against
  Ross."  ECF No. 353 at 32.  These issues are fully addressed in the Conclusions of
  Law at pages 34-35 and 44-45.

- That the judgment for contribution PCS obtained against Ross in the CERCLA
  case for $87,404.72 cannot be the basis for setting aside the distribution since
  PCS cannot collect against Ross until it has paid more than its 30% share and it is
  undisputed that this has not occurred.  ECF No. 353 at 37.  The court addressed
  this issue on page 44-45 of its Conclusions of Law.

- That cash transfers may not be voided under the Statute of Elizabeth.  ECF No.
  353 at 38.  This issue is fully addressed in the Conclusions of Law on pages 33-
  34.

- That the court committed an error of law in shifting the burden of proof to the
  Shareholder Defendants. The exception shifting the burden of proof to the
  transferee for intra-family transfers does not apply to a board that is not comprised
  of only family members that approves distributions to all the corporation's
  shareholders, a large portion of whom are not related to any board members,
  pursuant to a duly approved plan of liquidation.  ECF No. 353 at 40.  The
  Conclusions of Law discuss the burden of proof, including these specific
  arguments, on pages 36-40.

Ross presented no intervening change in controlling law to support its position.  A

motion for reconsideration "is not a vehicle for obtaining post judgment reargument on issues

already decided." *Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 932 F. Supp. 761, 762

(E.D. Va. 1996) (citing *Durkin v. Taylor,* 444 F. Supp. 879, 889–90 (E.D.Va.1977)).  "Mere

disagreement with the court's interpretation of the law is not an appropriate ground for a Rule

59(e) motion. *Id.* (citing *Hutchinson v. Staton,* 994 F.2d  1076, 1082 (4th Cir. 1993)).  "Where

the motion asserts only an erroneous view of the law, the proper recourse is appeal." *Id.* (citing

*Durkin,* 444 F. Supp. at 889).  The motion for reconsideration as to the objections listed above is

denied because in them Ross only expresses disagreement with the court's view of the law and

"rehash[es] arguments previously considered and rejected by the district court." *Torre v. Federated Mut. Ins. Co.*, 862 F. Supp. 299, 300-01 (D. Kan. 1994).

Because the court declines to revisit its decision shifting the burden of proof, the court also declines Ross's invitation, presented at ECF No. 353 at 45-51, to analyze the merits of the case as if PCS bore the burden of proof.

The Ross Shareholders argue that PCS's fraudulent conveyance claim is barred by S.C. Code Ann. § 33-14-107 governing suits against dissolved corporations. For the same reasons discussed *supra* Part II.B.3—namely that this suit is brought against the transferees, and not the dissolved corporation itself—this argument must fail.[14] The Ross Shareholders' challenges to the Findings of Fact and Conclusions of Law with respect to Ross's insolvency, PCS status as a creditor, and the statute of limitations have been fully addressed by the Amended Findings of Fact and Conclusions of Law issued contemporaneously with this order.

The motion for reconsideration is denied as to the above objections.

**D. The Ross Shareholders' Objection to the Conclusion of Law: the Court's Consideration of PCS's Indemnification Claim**

The Ross Shareholders ask the court to amend its Conclusions of Law to remove all mention of PCS's indemnification claim pursuant to the 1966 indemnification contract. The Shareholders make two arguments on this point: first, they contend "PCS's Amended Complaint makes no mention of PCS's indemnification claim in the CERCLA case"; second, they argue that PCS bound itself by a representation to the court that it was not seeking to recover in this

---

[14] Furthermore, as discussed hereinafter, the Statute of Elizabeth was not changed by the Business Corporation Act and the rights PCS asserts are conferred by the Statute of Elizabeth specifically, not by the Business Corporation Act.

action the amount of any future indemnification judgment.  ECF No. 352 at 35-36 (citing to the transcript of the hearing on PCS's motion to lift the stay).

The importance of the 1966 contract to this case is to show PCS's status as a potential subsequent creditor of Ross.  The contract is indeed mentioned in PCS's First Amended Complaint.  ECF No. 34, ¶ 37 (". . . Planters entered into an indemnification agreement with CNC. . . any contamination at the Site that was the result of acts or omissions prior to the transfer of the Site . . . . [and] any costs or expenses that CNC incurs arising from Planters' acts and omissions are the sole responsibility of Planters, now Ross."); ¶ 90 ("PCS has suffered and continues to suffer damages. These damages include the costs and expenses incurred by PCS in opposing Ross' inability to pay defense in the Ashley litigation . . .").  The indemnification contract was admitted as evidence in this case and the court heard testimony about the various legal costs incurred by Ross.  *See* Pl.'s Ex. 3.

Ross also argues that PCS waived recovery in this action on the indemnity judgment because it made a binding "judicial admission" to the court that it was not seeking recovery on the indemnity contract in this case.  At the hearing on PCS's motion to lift the stay, the following exchange took place:

> The Court: Okay. The contract indemnification issue in the Ashley litigation was recently argued before the South Carolina Supreme Court on March the 4th. Would it be expeditious for the Court to wait for the resolution of this issue before lifting the stay in this matter?
>
> Counsel for PCS: No, it would not, Your Honor. We're not seeking through this action to recover the costs and expenses that are subject to that indemnification claim. The indemnification claim is still being finally resolved in the Ashley litigation. At this time in this action we're just seeking to recover the response costs that are due to PCS under the Court's CERCLA judgment, which

44

> has already been tried for final judgment and, as Mr. Williams
> indicated, appealed all the way up to the Supreme Court and
> affirmed.
>
> The Court: Okay. All right. Thank you very much. . . .

ECF No. 242 at 11:4-19 (Mot. to Stay Hr'g Tr., Apr. 2, 2014). The decision of a judge "to treat,

as conclusive," concessions or statements made by counsel at prior stages of litigation is "a

matter for the judgment of the judge." *United States v. Cline*, 388 F.2d 294, 296 (4th Cir. 1968).

"Although a lawyer's statements may constitute a binding admission of a party, any such

statement must be deliberate, clear, and unambiguous before we will afford it preclusive effect."

*Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty.*, 608 F.3d 183, 190 (4th Cir.

2010) (internal quotations and citation omitted).

   The argument surrounding the indemnity contract is much the same as that made by Ross

surrounding proof of PCS's CERCLA damages. PCS realized that the procedure for establishing

its CERCLA damages was in a CERCLA suit and not this case. Similarly, the proof of damages

due under the contract was a proper subject for the *Ashely II* litigation and not this case. In the

court's understanding, counsel for PCS was simply saying that there was no need for PCS to

abandon the *Ashley II* proceedings and force the contract damages issue into this case. As with

the CERCLA claim, what matters for this case is the existence of a debt owed to PCS by Ross

that establishes PCS's status as creditor entitling it to void the challenged conveyances. The

CERCLA damages and the indemnity damages are to be quantified in parallel proceedings; here,

however, they are relevant because the existence of these claims proves PCS's status as a

potential subsequent creditor of Ross.

The court did not award indemnity damages in this case. That was properly a matter for the *Ashley II* case.  Counsel for PCS in the above exchange essentially agrees – PCS sought to recover its costs and fees due under the contact in *Ashley II*.  In this case, PCS seeks to void the distributions. The two are distinct proceedings. The court therefore declines to amend its Conclusions of Law to remove reference to PCS's indemnification claim.

### E. The Remedy

In its Findings of Fact and Conclusions of Law on PCS's fraudulent conveyance claim, the court entered a declaratory judgment voiding the challenged transfers to the Ross Shareholders and ordered a constructive trust placed over the funds in the possession of the Ross Shareholders for the benefit of Ross's creditors.  ECF No. 345 at 43-45.  PCS had asked that a constructive trust be placed over any funds found to be fraudulently conveyed in its complaint. ECF No. 34.  In placing a constructive trust over the distributions to shareholders the court observed:

> [A]n action to declare a constructive trust is in equity.  *Lollis v. Lollis*, 354 S.E.2d 559, 561 (S.C. 1987).  "A constructive trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by the one holding the legal title."  *Id.*  A constructive trust results from fraud giving rise to "an obligation in equity to make restitution."  *Id.*

ECF No. 345 at 44.  The court also held that PCS cannot recover any of the funds in the constructive trust "until it establishes the amount it is owed as a subsequent creditor of Ross." *Id.* at 45.  The court's order implied that the Ross Shareholders would pay a sum equal to their distributions into a trust to be held by the court. PCS or other creditors of Ross could then apply to the court with proof of the debt owed them by Ross and receive a disbursement from the trust.

Ross observes, correctly, that the court has actually established an express trust, rather

46

than a constructive trust. The court's remedy is missing several characteristics of a constructive trust and, if the order were amended to properly effect a constructive trust, the goal of the remedial scheme outlined by the court would be frustrated.

First, the focus of the constructive trust remedy is on the culpability of the current holders of the property at issue, i.e. the Shareholders. "A constructive trust arises whenever a party has obtained money which does not equitably belong to him . . . ." *SSI Med. Servs., Inc. v. Cox*¸ 392 S.E.2d 789, 793-94 (S.C. 1990). The constructive trust operates "against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of a wrong or by any form of unconscionable conduct, artifice, concealment, or questionable means and against good conscious, either has obtained, or holds the right to property, which he ought not in equity and good conscience hold and enjoy." *Doe v. Roe*, 475 S.E.2d 783, 786-87 (S.C. Ct. App. 1998). In the fraudulent conveyance cause of action, the focus is on the wrongdoing of the transferors, in this case, the Directors. For a constructive trust to arise, the transferee must also be a wrongdoer. Here, the evidence does not support a finding that the Shareholders acted with any wrongful intent or perpetrated a fraud, so they should not be subject to a constructive trust.

Second, a constructive trust may only be placed over identifiable property. "It is essential that the property subject to the trust, or the trust res, be ascertainable and sufficiently identifiable." *Uhlig, LLC v. Shirley*, No. 6:08-CV-01208-JMC, 2012 WL 2711505, at *2 (D.S.C. July 9, 2012) (citing 76 Am. Jur. 2d *Trusts* § 175); *see also Harmon v. Harmon*, 71 S.E. 815, 816 (S.C. 1911) ("[E]quity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrongdoer, but as long as it can be followed and identified in whosesoever hands it may come . . . ."). Here, the court imposed a constructive

trust over cash distributions made between nine and sixteen years ago. Ross contends: "The money that was distributed back then is no longer identifiable" because the funds may have been spent and taxes paid on them. ECF No 352 at 64-65. Furthermore, PCS has not identified any particular fund or property to which the constrictive trust is to apply. *See Uhlig*, 2012 WL 2711505 at *3 (refusing to impose a constructive trust where the proponent had not "identified any particular fund or property to which the constructive trust should apply"). Finally, in a constructive trust, the funds are held only for a single beneficiary and not for the benefit of all creditors.

Usually, when a transfer is voided under the Statute of Elizabeth, the funds are returned to the transferor-corporation or -individual. Here, of course, a return of the funds to Ross is impossible because Ross is dissolved and no longer exists. The fact of Ross's dissolution should not operate to shield the Shareholders from liability for transfers void as fraudulent conveyances. The court therefore amends its order to establish a trust for the benefit of Ross's creditors, to be administered according to details to be determined at a subsequent time. The Shareholders are ordered to fund the trust with amounts equal to the distributions they received that have been voided by the court.

The fraudulent conveyance action is an equitable action. In equity, a federal court has the power to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944). "Flexibility rather than rigidity" is the hallmark of equity, which allows "for nice adjustment" between competing private claims. *Id*. In the circumstances of this case, the court relies on the equity maxim that "equity will not suffer a wrong to be without a remedy." "The equitable power of a court is not bound by cast-iron rules but exists to do fairness

48

and is flexible and adaptable to particular exigencies so that relief will be granted when, in view of all the circumstances, to deny it would permit one party to suffer a gross wrong at the hands of the other." *Hooper v. Ebenezer Sr. Servs. & Rehab. Ctr.*, 687 S.E.2d 29, 33 (S.C. 2009) (quotation and citation omitted); *see also Regions Bank v. Wingard Properties, Inc.*, 715 S.E.2d 348, 355 (S.C. Ct. App. 2011) ("[W]here a substantive right exists, an equitable remedy may be fashioned to give effect to that right."); *Ex parte Dibble*, 310 S.E.2d 440, 442 (S.C. Ct. App. 1983) ("Courts have the inherent power to do all things reasonably necessary to insure that just results are reached to the fullest extent possible."). The creation of an express trust funded by the Shareholders and Directors in the amount of the void distributions is a remedy that will vindicate the Ross creditors' right to void fraudulent conveyances.

### F. Collection Procedures and Amendment of the Judgment

Both the Ross Shareholders and the Ross Directors seek more detail on collection procedures.  The objection by the Ross Directors that PCS cannot collect on its judgment against them for breach of fiduciary duty until it has paid more than its thirty percent share of response costs at the Site has been mooted by the court's grant to the Directors of judgment notwithstanding the verdict.  The Ross Shareholders object to this court's discussion of the election of remedies doctrine in its Findings of Fact and Conclusions of Law.  After the grant of judgment notwithstanding the verdict, there is only one remedy remaining to PCS.  The court therefore amends its Findings of Fact and Conclusions of Law to remove discussion of the election of remedies doctrine.[17]

As part of their objections to the judgment, the Ross Shareholders seek five amendments:

_____

[17] Also mooted by the grant of judgment notwithstanding the verdict is the Directors' motion for remittitur.

49

1)  to state clearly the Court's intent as to the maximum amount of the judgment;

2)  to reflect the remedy chosen by PCS;

3)  to reduce the judgment amount by the income taxes paid by each of the Shareholders on the distributions;

4)  to state explicitly that there can be no execution or collection until PCS has demonstrated it has paid more than its 30 percent share of the judgment obtained against it by Ashley II or demonstrated it has paid more than its 30 percent share of the total response costs for remediating the Site;

5)  to confirm PCS cannot collect any judgment on its indemnification claim in the CERCLA case from funds from the voided distributions that are to be administered by the court.

ECF No. 351 at 65.  The first two objections are mooted by the grant of judgment notwithstanding the verdict to the Ross Directors on PCS's breach of fiduciary duty claim. The three remaining issues are addressed briefly below.

### *1. Should the judgment amount be reduced to account for taxes already paid?*

The Ross Shareholders argue a reduction to account for taxes paid is proper because they no longer have a portion of the cash conveyed to them because they paid it in taxes.  "They cannot convey back what they no longer possess."  ECF No. 351 at 66.  Ross does not cite any authority to support its argument.  Although PCS called the suggestion that the judgment should be reduced by the amount of taxes "ludicrous and completely unsupported by case law," PCS itself does not provide any case law supportive of its position.  ECF No. 363 at 39.  The Ross Shareholders presented no proof of the amount of taxes paid.  The court therefore has no basis on which to make the necessary calculations even if it were so inclined.  Amendment on this point is denied.

### *2. Should the judgment be amended to state "explicitly" when PCS can collect?*

The Ross Shareholders' concerns about the timing of collection are unwarranted. In its

Findings of Fact and Conclusions of Law the court stated:

> Finally, the court notes that PCS has yet to establish the amount of response costs it has incurred at the Site above and beyond the share apportioned to PCS in the *Ashley II* litigation. This amount will represent the amount of the debt owed to PCS by Ross, in accordance with the apportionment scheme determined in *Ashley II*. PCS cannot, therefore, recover any of the funds in the constructive trust until it establishes the amount it is owed as a subsequent creditor of Ross. *See PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 186 n.11 (4th Cir.), *cert. denied*, 134 S. Ct. 514, (2013) (noting that considering this court's "order denying modification of the money judgment explicitly recognized that PCS cannot recover from Ross until it has paid more than its proportionate share to Ashley. Considering the court's clarification on the record, we find no error in the form of the money judgment."); *see also Ashley II*, ECF No. 660 at 4 ("PCS cannot collect upon its judgments against contributing tortfeasors until it has paid more than its share of the judgment entered in favor of Ashley . . . .").

ECF No. 345 at 45. The order thus makes clear that PCS cannot collect until it has paid more

than its apportioned share under the *Ashley II* CERCLA judgment. Amendment of the judgment

on this point is denied.

### *3. Should the judgment be amended to confirm PCS cannot collect any judgment on its indemnification claim in the CERCLA case from funds from the voided distributions?*

As the court concluded *supra* Part III.D., the indemnity debt forms part of the basis on

which PCS is entitled to void the distributions at issue as fraudulent conveyances. Thus, PCS

may collect its judgment on its *Ashley II* indemnity claim out of the voided transfers. The

primary purpose of the trust, however, is to ensure that funds are available to cover Ross's forty-

five percent share of remediation costs at the Site. The court therefore holds that no funds will

51

be disbursed from the trust until remediation of the Site is complete and a final calculation of

damages has been made.

### IV. Additional Amendments to the Findings of Fact and Conclusions of Law

The court's grant of judgment notwithstanding the verdict to the Ross Directors on the

ground that PCS is not entitled to bring a direct claim against them for breach of fiduciary duty

requires the court to further amend its Findings of Fact and Conclusions of Law beyond those

amendments discussed *supra* Part III.B.

### A.  The Court's Authority to Amend Its Own Orders

A district court has wide discretion to reconsider interlocutory orders.  Although final

orders "trigger heightened standards for reconsideration," motions for reconsideration of

interlocutory orders are not subject to the same strict standard.  *Am. Canoe Ass'n v. Murphy*

*Farms, Inc.,* 326 F.3d 505, 514-15 (4th Cir. 2003).  "[A] district court retains the power to

reconsider and modify its interlocutory judgments, including partial summary judgments, at any

time prior to final judgment when such is warranted."  *Id.*

The Fourth Circuit has also held that a district court may amend its final judgment.  A

district court may do this even on grounds not raised by the parties in their motions for

reconsideration:

> Manifestly, the District Judge, sitting without a jury, had the authority to
> amend his original order pursuant to plaintiff's motion. Rule 59, F. R. Civ.
> P. [sic] Appellee's argument is that since the plaintiff's motion to amend
> was related to the quantum of the damage award, the judge was limited to
> a consideration of that point and was without authority to amend the order
> in respect to [ ] negligence. The argument is without force, for a district
> judge is not restricted to the modifications suggested by the parties. Rule
> 59(a) takes a broader view:

> On a motion for a new trial in an action tried
> without a jury, the court may open the judgment if
> one has been entered, take additional testimony,
> amend findings of fact and conclusions of law or
> make new findings and conclusions, and direct the
> entry of a new judgment.

> The rule accords with reason. A district judge should not be forced to
> perpetuate a finding of fact or conclusion of law which he discovers to be
> erroneous.

*United States v. Hollis*, 424 F.2d 188, 191 (4th Cir. 1970) (quotations and citations as in the

original). Exercising the power granted by Fed. R. Civ. P. 59 and delineated in *Hollis*, the court

makes the following amendments to the Finding of Fact and Conclusions of Law.

### B. PCS no longer has an adequate remedy at law as to the Ross Directors

In response to a motion by the Defendants for judgment as a matter of law on the

fraudulent conveyance claim, the court entered an order on October 29, 2014, granting in part

and denying in part the Defendants' motion. *PCS Nitrogen, Inc. v. Ross Dev. Corp.*, No. 2:09-

CV-03171-MBS, 2014 WL 5503369, at *1 (D.S.C. Oct. 29, 2014) (ECF No. 344). In that order,

the court considered the question of whether an adequate remedy at law existed against the

Defendants so as to preclude a proceeding in equity on the fraudulent conveyance claim. *Id.*

The court concluded that an adequate remedy at law existed as to the Ross Directors because of

the jury verdict on the breach of fiduciary duty claim, but that no adequate remedy at law existed

as to the Ross Shareholders: "Because of the jury verdict for PCS on the breach of fiduciary

duty claim, PCS has an adequate remedy at law precluding equitable proceedings against the

Ross Directors. The fraudulent conveyance claim against the Ross Directors is dismissed without

prejudice." *Id.* at 8.

The court defined the meaning of "adequate remedy at law" under South Carolina law:

> "Under South Carolina law, "[a]n action to set aside a conveyance under the Statute of Elizabeth is an equitable action." *Oskin v. Johnson*, 735 S.E.2d 459, 463 (S.C. 2012). "Equitable relief is generally available where there is no adequate remedy at law." *Santee Cooper Resort, Inc. v. S. Carolina Pub. Serv. Comm'n*, 379 S.E.2d 119, 123 (S.C. 1989). The South Carolina Supreme Court has observed:
>
>> In order to justify a court of equity in refusing to take jurisdiction, the remedy at law must be adequate, and must attain the full end and justice of the case. It is not enough that there is some remedy at law, but that remedy must be as practical, efficient, and prompt as the remedy in equity.
>
> *Chisolm v. Pryor*, 35 S.E.2d 21, 24 (S.C. 1945). Stated differently, the remedy at law must be as "certain" and "complete" as the equitable remedy. S*ee ZAN, LLC v. Ripley Cove, LLC*, 751 S.E.2d 664, 669 (S.C. Ct. App. 2013); *Milliken & Co. v. Morin*, 685 S.E.2d 828, 832 (S.C. Ct. App. 2009); *Key Corp. Capital, Inc. v. Cnty. of Beaufort*, 602 S.E.2d 104, 107 (S.C. Ct. App. 2004) *rev'd*, 644 S.E.2d 675 (S.C. 2007) (finding the specific remedy at law in the case adequate and reversing the grant of equitable relief)."

ECF No. 344 at 3.

In light of court's analysis of the causes of action available to creditors, *supra* Part II.B., PCS does not have a direct breach of fiduciary duty claim against Ross.  Further, the court in its 2010 order on the motion to dismiss and the motion to amend the complaint, ECF No. 30, prevented PCS from asserting a derivative claim for breach of fiduciary duty.  On the basis of the foregoing, the court concludes PCS *did not* have an adequate remedy at law against the Ross Directors, and should therefore be permitted to proceed against them in equity under the Statute of Elizabeth.   The court hereby vacates that part of its October 29, 2014 order that dismisses

without prejudice PCS's fraudulent conveyance claim against the Ross Directors.  ECF No. 344.

As is evident in the Amended Findings of Fact and Conclusions of Law filed in conjunction with

this order, the court has reinstated the Ross Directors as Defendants in PCS's fraudulent

conveyance claim. The Amended Findings of Fact and Conclusions of Law reflect the court's

judgment that the distributions the Ross Directors made to themselves are void pursuant to the

Statute of Elizabeth and should be returned to the trust established in that order in the same

manner as the void distributions to the Ross Shareholders.

### V. Sanctions

PCS filed motions for sanctions against the Ross Directors and the Ross Shareholders.

ECF Nos. 361 & 362.  These motions were subject to responses and replies.  With respect to the

Ross Directors, PCS argues that the Directors improperly raise new arguments that were never

raised pre-judgment, and which are, therefore, improper subjects for a Rule 50(b) or 59(e)

motion.  PCS's motion with respect to the Shareholders is the converse.  In that motion, PCS

argues that the Shareholders have improperly and vexatiously raised *the same* arguments in their

Rule 52(b) motion that they previously made to the court at trial and in their briefing.

The court has authority to issue sanctions pursuant to 28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in any
> court of the United States or any Territory thereof who so
> multiplies the proceedings in any case unreasonably and
> vexatiously may be required by the court to satisfy personally the
> excess costs, expenses, and attorneys' fees reasonably incurred
> because of such conduct.

28 U.S.C. §1927. The court also possesses the inherent authority to regulate proceedings before

it. This authority includes the imposition of sanctions.  "The district court has the inherent

authority to impose sanctions against a party who 'has acted in bad faith, vexatiously, wantonly,

or for oppressive reasons.'" *Thomas v. Ford Motor Co.*,  244 F. App'x 535, 538 (4th Cir. 2007)

(quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46 (1991)). "This inherent authority

'extends to a full range of litigation abuses.'" *Id.* (citing *Chambers*, 501 U.S. at 46).

The imposition of sanctions on these facts is a matter for the discretion of the court.

PCS's characterization of the motions as frivolous is belied by the results they have achieved –

namely, judgment notwithstanding the verdict and amendment of the Findings of Fact and

Conclusions of Law. PCS's motions for sanctions, ECF Nos. 361 and 362,  are **denied**.

### VI. Conclusion

In accordance with the forgoing, the motion of the Ross Directors for judgment

notwithstanding the verdict, ECF No. 351, is **granted**.  The motion of the Ross Shareholders for

reconsideration and amendment of the court's Findings of Fact and Conclusions of Law is

**granted in part and denied in part**.  PCS's motions for sanctions against the Ross Directors

and the Ross Shareholders, ECF Nos. 361 and 362, are **denied**.  The court's order dismissing

PCS's fraudulent conveyance claim against the Ross Directors without prejudice, ECF No. 344,

is **vacated in part**.  The court's Amended Findings of Fact and Conclusions of Law are filed

contemporaneously with this order.

**IT IS SO ORDERED.**


s/ Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge


Columbia, S.C.
August 21, 2015