UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| PCS NITROGEN, INC., | ) | Case No. 2:09-cv-03171-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED** |
| | ) | **FINDINGS OF FACT** |
| ROSS DEVELOPMENT CORPORATION; | ) | **AND** |
| T. HEYWARD CARTER, JR.; GRAYSON | ) | **CONCLUSIONS OF LAW** |
| G. HANAHAN; WILLIAM O. | ) | |
| HANAHAN, III; KATHARYNE H. RIKE; | ) | |
| ESTATE OF G.L. BUIST RIVERS, JR.; | ) | |
| MIKELL R. SCARBOROUGH; C. | ) | |
| COTESWORTH PINCKNEY AND T. | ) | |
| HEYWARD CARTER, AS CO-TRUSTEES | ) | |
| OF THE TRUST OF WILLIAM O. | ) | |
| HANAHAN, JR.; ANN HANAHAN | ) | |
| BLESSING; DONALD BUHRMASTER, | ) | |
| III; ELEANOR W. CARTER; MARGARET | ) | |
| H. CARTER; ELIZABETH H. CLARK; | ) | |
| MARIA GRAYSON-METAXAS; BUIST | ) | |
| L. HANAHAN; ELIZABETH A. | ) | |
| HANAHAN; FRANCES G. HANAHAN; | ) | |
| MARY ROSS HANAHAN; MURIEL R. | ) | |
| HANAHAN; ROGER PARKE | ) | |
| HANAHAN, JR.; GRAYSON C. | ) | |
| JACKSON; ORIANA H. KIRBY; AND | ) | |
| JEANNE DEFOREST SMITH HANAHAN, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court after trial for final disposition of Plaintiff PCS Nitrogen, Inc.'s ("PCS") cause of action for fraudulent conveyance. The claims in this case arise out of litigation that resolved liability under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") for the remediation of the Columbia Nitrogen Superfund Site ("Site") in Charleston, South Carolina. *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, Case No. 2:05-

1

cv-02782-MBS (D.S.C.) (hereinafter *Ashley II*). Both PCS and Defendant Ross Development Corporation ("Ross") are former owners and operators of the Site that were parties to the *Ashley II* action and were found liable for response costs at the Site. PCS brought this action on December 8, 2009, to recover funds from Ross, T. Heyward Carter, Jr. ("Carter"); Grayson G. Hanahan; William O. Hanahan, III ("Hanahan"); Katharyne H. Rike ("Rike"); Mikell R. Scarborough ("Scarborough"); and the Estate of G.L. Buist Rivers (collectively the "Ross Directors"); as well as C. Cotesworth Pinckney and T. Heyward Carter as co-trustees of the Trust of William O. Hanahan, Jr.; Anne Hanahan Blessing; Donald Buhrmaster, III; Eleanor W. Carter; Margaret H. Carter; Elizabeth H. Clark; Maria Grayson-Metaxas; Buist L. Hanahan; Elizabeth A. Hanahan; Mary Ross Hanahan; Muriel R. Hanahan; Roger Parke Hanahan, Jr.; Grayson C. Jackson; Orianna H. Kirby; and Jeanne Deforest Smith Hanahan (collectively the "Ross Shareholders").[1] ECF No. 1. PCS dismissed its claim against the Estate of G.L. Buist Rivers on June 10, 2011 (ECF No. 91) and against Maria Grayson-Metaxas on July 17, 2014 (ECF No. 294).

PCS proceeded to trial on three of the causes of action in its Amended Complaint: (1) an action under the Statute of Elizabeth (S.C. Code Ann. § 27-3-10(A)) to set aside alleged fraudulent conveyances brought against Ross, the Ross Directors, and the Ross Shareholders; (2) an action for an alleged civil conspiracy brought against the Ross Directors; and (3) a direct claim for alleged

---

[1] Because not all shareholders of Ross and not all directors of Ross during the relevant period are defendants in this action, the universe of shareholders and directors is necessarily broader than those individuals encompassed in the terms "Ross Shareholders" and "Ross Directors." When referring only to the parties to this action, the Court will use the terms "Ross Shareholders" and "Ross Directors." However, when discussing groupings of shareholders or directors including individuals not named as defendants in this action, or when discussing events involving more than the named parties, the court will not use the capitalized terms "Ross Shareholders" and "Ross Directors."

breach of fiduciary duty brought against the Ross Directors.  ECF No. 34.  The parties tried the equitable claim for fraudulent conveyance to the court at the same time as they tried the two legal claims to the jury.  At the conclusion of the trial on July 31, 2014, the jury returned a verdict for the Ross Directors on the civil conspiracy claim and a verdict for PCS in the amount of $5,555,158.00 against the Ross Directors on the breach of fiduciary duty claim. ECF No. 319.  According to the joint stipulations submitted to the jury, $5,555,158.00 is the exact amount of all distributions to all the shareholders of Ross from 1999 to 2006, when Ross dissolved.  ECF No. 312.  The jury declined to award PCS punitive damages.  ECF No. 319.

At an August 19, 2014 hearing, Defendants moved for judgment as a matter of law on the fraudulent conveyance claim.  ECF No. 325.  The court ordered the parties to prepare briefs addressing whether the jury's verdict provided PCS with an adequate remedy at law that precluded its recovery of equitable relief.  *Id.*  Those briefs were submitted to the court by September 12, 2014.  ECF Nos. 326, 327, 328, and 329.  On October 29, 2014, this court determined that the jury's verdict does not preclude the court from awarding PCS relief under its fraudulent conveyance claim.  ECF No. 344.  The court did, however, dismiss PCS's claim without prejudice to the extent that it was also brought against the Ross Directors—Carter, Grayson Hanahan, Hanahan, Rike, and Scarborough—because the breach of fiduciary duty claim tried to the jury provided an adequate remedy at law precluding equitable relief as to those Defendants.  *Id.* at 8.  The court permitted PCS's claim to proceed against the Ross Shareholders.  *Id.*  In the order on the post-trial motions accompanying this Amended Findings of Fact and Conclusions of Law, the court vacated in part its order of October 29, 2014, to the extent that order dismissed without prejudice PCS's fraudulent

conveyance claim against the Ross Directors. ECF No. 344. The Ross Directors thus remain defendants to PCS's fraudulent conveyance claim.

PCS's fraudulent conveyance claim alleges that the Ross Directors knew of contamination at the Site and that Ross could be liable for such contamination when they approved all the distributions to themselves and to the Ross Shareholders from 1992 through 2006. ECF No. 34. PCS's amended complaint asserts that from 1992 to 2006, "with knowledge of a future tort claim and with actual intent to evade liability for the Site and defraud Ross creditors, both existing and subsequent, including PCS," the Ross Directors voluntarily distributed all of Ross's assets to all the shareholders of Ross; and that such "distributions made Ross insolvent and unable to pay its creditors, including PCS." ECF No. 34, ¶¶ 69-71. In its fraudulent conveyance claim, PCS challenges only the distributions from 1998 to 2006. Summ. J. Hr'g Tr. 22:23-23:6 (ECF No. 343).

On November 4, 2014, the parties submitted proposed findings of fact and conclusions of law to the court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Rule 52(a) directs that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).

Having carefully considered the testimony, exhibits, deposition excerpts, trial briefs, and proposed findings of fact and conclusions of law, the court makes the following findings.

## I. FINDINGS OF FACT

### A. Background: The *Ashley II* Litigation

1.  Ross is a dissolved South Carolina corporation that was formed more than 100 years ago as Planters Fertilizer and Phosphate Company ("Planters"). From 1906 to 1966, Planters operated a fertilizer plant at the Site. Trial Tr. 69:5-14.

2. Planters sold the Site and its fertilizer plant operations to PCS's predecessor, Columbia Nitrogen Corporation ("CNC"), in 1966. Trial Tr. 69:21-23.

3. The sale of the Site was governed by a letter of agreement containing an indemnification clause in which Planters agreed to indemnify CNC "in respect to any acts, suits, demands, assessments, proceedings and costs and expenses resulting from any acts of [Planter's] occurring prior to the closing date . . . ." Pl.'s Ex. 3; Trial Tr. 124:2-17.

4. After the sale, Planters changed its name first to Ross Industrial Products and subsequently to Ross Development Corporation. Trial Tr. 65:22-66:2.

5. The property that Planters and CNC owned and operated is contaminated with lead and arsenic and must be remediated. Trial Tr. 69:15-20. Ross contributed lead and arsenic to the Site in significant quantities. *Id.*

6. In 2005, the EPA estimated that the total remedy costs would be roughly $7.882 million. Trial Tr. 304:10-16; Pl.'s Ex. 76.

7. Ashley II of Charleston, LLC ("Ashley"), bought the Site in 2003. Initially, Ashley planned to remediate the Site. In 2005, Ashley sued PCS under CERCLA to recover its remediation costs. *See Ashley II*. PCS brought counterclaims against Ashley and claims against other former and current owners of the Site, who likewise filed their own cross-claims. *Ashley II*, ECF No. 627 at 1. These third-party defendants included Ross; James H. Holcombe, J. Holcombe Enterprises, L.P., J. Henry Fair, Jr. (Collectively "Holcombe and Fair"); Allwaste Tank Cleaning, Inc. ("Allwaste"); Robin Hood Container Express ("RHCE"); and the City of Charleston.

5

8. After Ross was added as a third party defendant in the CERCLA case, and following a bench trial, the court determined, among other things, that PCS was jointly and severally liable to Ashley II for the response costs it had incurred. *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 167 (4th Cir.), *cert. denied,* 134 S. Ct. 514 (2013).   As to the counterclaim and third-party claims, the court equitably allocated liability for the past and future response costs as follows:  forty-five percent to Ross; thirty percent to PCS; sixteen percent to Holcombe and Fair; five percent to Ashley; three percent to Allwaste; one percent to RHCE; and zero percent to the City of Charleston.  *Id.* at 185; *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, 746 F. Supp. 2d 692, 754 (D.S.C. 2010); Trial Tr. 131:10-132:2.

9. The court entered judgment for Ashley II against PCS for $147,617.02 plus interest and judgment for PCS against Ross for $87,404.82 plus interest.  *Ashley II*, ECF No. 628.  The court also held that "PCS cannot collect upon its judgments against contributing tortfeasors until it has paid more than its share of judgment entered in favor of Ashley in this case." *Ashley II*, ECF No. 660 at 4.  The Fourth Circuit affirmed these rulings.  *PCS Nitrogen,* 714 F.3d 161, 186 n.11 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 514 (2013).

10. At the time, litigation was pending against Ross's insurers, shareholders, and directors to restore assets to Ross so that it could pay its share of response costs.  *Ashley II*, ECF No. 627 at 93.  The court held that if this litigation was unsuccessful, Ross's forty-five percent share of costs would be deemed to be an orphan share that would have to be borne by other solvent, liable parties.  *Id.* at 114-15.

11.    Through its fraudulent conveyance claim, PCS seeks to recover funds that can be used to pay response costs.  Specifically, PCS seeks to void distributions made by the Ross Directors to the Ross Shareholders during the period 1998 to 2006.

**B. Ross and The Hanahan Family**

12.    Ross was founded by J. Ross Hanahan and was for the duration of its existence a privately-held corporation. Ross's shares did not trade publically.  At the time of dissolution in 2006, Ross had 36,640 shares outstanding and 71 shareholders. Defs.' Ex. 6, Pl.'s Ex. 108 at 1-9. The shares were not traded; rather, they were largely inherited or gifted within families descended from J. Ross Hanahan.  Trial Tr. 715:11-18.

13.    During the period from 1998 to 2006, the Hanahan family controlled the Ross board of directors.     The directors—Carter; Scarborough; Rike; Hanahan; and Grayson Hanahan—were all descendants of J. Ross Hanahan.  Trial Tr. 745:2-4; *see generally* ECF Nos. 166-5, 166-23 (responses by Defendants to requests for admission).  With the exception of Buist Rivers, each director represented the lineal descendants of the children of J. Ross Hanahan.  Trial Tr. 739:19-21.

14.    The directors were "selected" by members of their branch of the family line for service on the corporation's board.  Trial Tr. 165:20-166:1; 166:12-16; 739:16-21.  In at least one instance, a seat on the board was passed from father to son.  Trial Tr. 972:24-25.

15.    Although some of the seventy-one shareholders at the time of dissolution were not individuals related to J. Ross Hanahan (e.g., G.L. Buist Rivers, Jr.), all of the Ross Shareholders remaining in this action are members of the Hanahan family.  *See* ECF Nos. 166-5, 166-23; Trial Tr.  49:12-15 (statement of Ross's counsel during opening statement:

"One thing [defendants] all have in common is that they are Hanahans by blood or marriage, descended from Ross Hanahan, and they were shareholders of Ross Development Company.").

16.    The Ross Shareholders include sisters, brothers, wives, children, aunts, uncles, and cousins of the Ross Directors. ECF Nos. 166-5, 166-23; Trial Tr. 66:16-18, 101:4-14, 145:17-146:3; 738:5-14.

17.    Except for Carter, who transferred his shares to his wife and children, all of the Ross Directors were also Ross shareholders. Trial Tr. 66:14-18. Thus, when the Ross Directors approved distributions, they were approving distributions, in large part, to themselves and to their family members.

18.    Hanahan family board members controlled when and whether distributions were made to Ross shareholders, who were also mostly Hanahan family members. As the board sold Ross's real property, Hanahan family members were in close touch with the Ross Directors to ensure that they would promptly receive distributions from the sale proceeds. Trial Tr. 166:12-16.

19.    The Ross Directors knew the Site had been used as a fertilizer plant, but none had ever been to the Site. Trial Tr. 200:10-16. None of the Ross Shareholders had ever been to the Site. ECF Nos. 166-5, 166-23.

20.    Being a director of Ross involved attending board meetings and signing documents on occasion. Trial Tr. 744:16-19. Rike testified that her role on the Board of Directors took ten to fifteen hours a year. Trial Tr. 744:20-23. It was a volunteer, non-salary position that came with no training. Trial Tr. 164:21-166:1; 744:24-745:1.

21. The Ross Directors relied on Ted Daniell ("Daniell") for financial and accounting matters, John Warren ("Warren") for corporate legal matters, and Jimmy Bailey ("Bailey") for land and development matters. Trial Tr. 745:9-20. Daniell also provided audited financial statements. Trial Tr. 426:15-18.

22. At the time the shareholders adopted the plan of liquidation (*see infra* Part I.C.), Ross's primary asset was a large tract of land of 550 acres known as the Dotterer Tract in the West Ashley area of Charleston near Bees Ferry Road. Defs.' Ex. 57 at 27, 89; Trial Tr. 148:9-150:4, 797:14-798:15. The company's intent was to subdivide it and sell development parcels. Trial Tr. 160:2-5; Defs.' Ex. 57 at 103-106. Because the company was liquidating and could no longer actively sell its own real estate, the board resolved that James Bailey of Bailey & Associates, Inc. would manage, list, and sell the Dotterer Tract. Defs.' Ex. 57 at 92, 12. Bailey handled the marketing and limited development steps necessary to sell the development parcels. Trial Tr. 160:17-161:12, 163:12-164:2.

23. As noted in the minutes of the special meeting of the board of directors on January 27, 1984, the plan of liquidation centered around the Dotterer tract and was always "to encourage access to the property by way of an extension of the Highway 61 Expressway and to sell the property in large blocks as rapidly thereafter as possible." Defs.' Ex. 57 at 96.

24. The sales of tracts went slowly for reasons that included lack of ready vehicular access and extensive wetlands that diminished the developable acreage from 300 to 100 acres. Trial Tr. 825:10-23, 161:24-162:14, 802:24-802:5. Sales picked up considerably around 1995 upon the completion of the Glenn McConnell Expressway that bisected the Dotterer tract and

provided access to it by a major highway as well as frontage on that highway.  Trial Tr. 806:6-23, 814:10-16, 162:19-163:11; *see also* Defs.' Ex. 57 at 198-199, 202-203.

25.    During this period, the primary business of the company was the development and sale of parcels from the Dotterer Tract.  Trial Tr. 739:22-740:8.

26.    The Ross Directors met at Carter's law office on Church Street to discuss old and new business, primarily regarding the Dotterer Tract. Trial Tr. 740:14-19.  In the early years, the Directors met four or five times a year until sales at the Dotterer Tract increased when they would meet more frequently to review contracts of sale procured by Bailey. Trial Tr. 739:22-740:8.  The Ross Directors were not involved with the day to day business of the company.

27.    At their meetings, Carter kept accurate minutes. Trial Tr. 743:24-744:15.  Rike testified that there was never an instance where the board specifically and purposefully asked for something to be omitted from the minutes. Trial Tr. 744:12-15.

28.    The Ross shareholders met annually on the fourth Thursday in February.  Trial Tr. 740:9-10.

29.    Ross maintained its own bank accounts, separate and distinct from those of its officers, directors, and shareholders.  *See* Trial Tr. 254:20-255:6; 753:2-8; Defs.' Ex. 57.

30.    From 1992 through 2006, the Ross Directors authorized the following gross amounts of distributions to all of Ross's shareholders:

    a.     January-February, 1992 - $73,269.00
    b.     September, 1997 - $334,751.00
    c.     March 1999 - $739,268.00
    d.     June, 1999 - $292,123.00
    e.     January-March, 2000 - $164,882.00
    f.     May, 2002 - $916,153.00
    g.     October, 2004 - $1,831,732.00
    h.     August, 2005 - $916,010.00
    i.     July, 2006 - $659,552.19
    j.     December, 2006 - $35,429.61

ECF No. 312 (Joint Stipulations); *see also* Appendix A.

31.    A compilation of the details of shareholder distributions from 1998 to 2006 to the Ross Directors and the Ross Shareholders according to the Joint Stipulation of the parties (ECF No. 312) is found in Appendix A.

32.    In 1992, Ross retained Warren as its corporate attorney to perform legal work associated with Ross's contracts to sell real estate. Trial Tr. 225:14-22.  Warren testified that he is not an environmental lawyer but that he has dealt with environmental issues in terms of allocation of risk in business transactions. Trial Tr. 221:23-225:17.

33.    In his role as corporate attorney, Warren annually received accounting audit letters from Ross's accountant, Daniell, requesting disclosure of certain items, including threatened claims and unasserted claims and contingencies. Trial Tr. 268:18-269:6.   In response to these requests from 1998 to 2006, Warren sent attorney audit letters to Daniell that stated that he was not aware of any pending or threatened litigation or contingent liabilities.[2] *See* Defs.' Ex . 15.

**C. Ross's Plan of Liquidation**

34.    In 1982, the then directors and shareholders of Ross adopted a plan of liquidation to be accomplished over the course of one year.  Trial Tr. 152:10-15, 154:5-16; Pl.'s Ex. 4.  The plan called for the company to sell all of its assets, pay its creditors, distribute whatever remained to the shareholders, and terminate the existence of the corporation during this time.

---

[2] The letters from Warren are dated January 26, 1996; February 5, 1998; January 25, 2000; February 6, 2001; February 18, 2002; March 4, 2003; January 14, 2004; February 4, 2005; and January 30, 2006.  Defs.' Ex. 15.

Trial Tr. 153:1-7; Pl.'s Ex. 4. Due to various circumstances, Ross was unable to accomplish its liquidation within the allotted year. Trial Tr. 154:17-155:14.

35. The shareholders then adopted an amended plan of liquidation in September of 1983. Defs.' Ex. 57 at 88-91; Trial Tr. 158:9-159:12. The amended liquidation plan provided that Ross would refrain from the active operation of a business and would continue to attempt to dispose of all of its remaining assets in an orderly manner at a price and on terms acceptable to its officers and directors. Defs.' Ex. 57 at 90.

36. The amended liquidation plan further provided "[t]hat the net proceeds of the sale of its assets which may be available from time to time for distribution to its Shareholders, after maintenance of a reasonable reserve for payment of debts and expenses as determined by its Directors, be distributed by the Company to its Shareholders in liquidation in return for the surrender by such Shareholders of a portion of their stock in the Company." Defs.' Ex. 57 at 90; Trial Tr. 158:9-159:12.

37. On December 19, 1983, Ross filed its intent to dissolve with the South Carolina Secretary of State. Defs.' Ex. 5; Trial Tr. 156:7-13. The company also published notice of its intent to dissolve in Charleston's daily newspaper, *The Post and Courier*. Defs.' Ex. 5A; Trial Tr. 156:14-19. The company ceased all active operations, closed its office, and no longer had employees. Trial Tr. 160:6-16.

38. During the liquidation of the company that started in 1982, the Ross Directors typically authorized distributions after the sale of each property if there were excess funds, keeping in reserve amounts to pay taxes, other expenses, and any unknown future liabilities. Ross "tried to keep a minimum of $200,000.00 in the accounts just in case something came up that

we didn't know about." Trial Tr. 106:9-15.

39.    Minutes from a special board meeting held December 4, 1986, state that $200,000.00 was the amount "previously set by the Directors as an optimum amount, to retain by the Company for known or unknown contingencies." Defs.' Ex. 57 at 120.  At that meeting, the board further discussed "the continued advisability of retaining approximately $200,000 in funds of the Company to meet expenses and other contingencies of the Company during the process of liquidation of the assets of the Company." Defs.' Ex. 57 at 120.

40.    Carter testified that from time to time, $200,000 was the number the directors decided on. Trial Tr. 199:8-10.  The $200,000 contingency reserve is discussed in the minutes of the December 17, 1987 meeting; the February 23, 1989 meeting; and the March 15, 2000 meeting.  Defs.' Ex. 57 at 128, 140, 238.

41.    Daniell, Ross's accountant of many years, testified if there was no revenue from land sales, there were no distributions made to shareholders. Trial Tr. 471:20-23, 475:1-476:2.

42.    Ross sold its last parcel in 2005.  Trial Tr. 823:15-22.

**D. Ross's First Notice of Potential Environmental Contamination at the Site - 1992**

43.    In 1992, the board first learned that the adjoining Koppers property was contaminated with creosote and that it was possible some of the creosote migrated to the property where Ross had formerly manufactured fertilizer.  At the time, Ross had been in dissolution for ten years and was in the process of liquidating Ross's real property holdings.  *See* Pl.'s Ex. 4.

44.    On January 24, 1992, an unknown law firm published a notice in *The Post and Courier* seeking information about the operations of companies in the Neck Area of Charleston, South Carolina, including both Planters and CNC.  Pl.'s Ex. 6; Trial Tr. 72:14-25.  The

notice appeared to be related to litigation over contamination at the Koppers Superfund Site, which is located to the south of the property where Planters formerly manufactured fertilizer. Trial Tr. 867:1-17.

45. The day that the article was published, Carter spoke to Warren, his friend and counsel to the Ross board of directors, about the article. Pl.'s Ex. 7; Pl.'s Ex. 10; Trial Tr. 228:13-18. Carter forwarded the notice to Warren by fax. Trial Tr. 73:12-17; Pl.'s Ex. 6. Scarborough also read the notice. Trial Tr. 375:14-376:14.

46. Three days later, on January 27, 1992, G.L. Buist Rivers ("Rivers"), who was then a board member, reached out to Timothy Bouch ("Bouch") regarding the notice. Pl.'s Ex 9 at 2; Trial Tr. 86:13-19. At the time, Rivers and Bouch worked at the same law firm. Trial Tr. 73:4-9, 868:1-3. Bouch represented a party in the litigation addressing contamination at the Koppers Site. Trial Tr. 73:4-9, 868:9-14.

47. In that litigation, Bouch learned that his client's property, which was previously owned by a fertilizer manufacturing company, was contaminated with creosote from Koppers' wood treatment operations. Trial Tr. 865:3-23. The parcel was located to the south of Braswell Street. *Id.* Based on the known operations of the grantees in the property's chain of title, there was no clear explanation for the presence of creosote. *Id.*; Trial Tr. 874:12-17. Bouch explained:

> At the time, I recall speaking with Rivers about it, I said, you know, even though we're on a fertilizer company's property, former fertilizer company's property, all we're finding is creosote. And we had tested up and down Braswell Street, we tested the Koppers property, we tested down Milford Street, it was all creosote related, or chromium copper arsenate, which was another preservative that Beazer, or Koppers, as they were then known, had utilized in wood preserving in the 1950s and 1960s.

14

Trial Tr. 868:20-869:3.   Bouch concluded that the contamination either migrated to the parcel or was placed there by someone.  Trial Tr. 873:12-18.

48.    Bouch informed Rivers that there might be creosote contamination on the Planters property. Bouch stated to Rivers "if it was a groundwater issue, if it was a migration issue, if it leached to the south, there's every indication it could have leached to the north."  Trial Tr. 874:19-22.  In fact, when Bouch and Rivers spoke, Bouch knew that not only his client's property, but also the ditch running down Milford Street and some other property to the north of Milford Street, had become contaminated with creosote.  Trial Tr. 871:25-872:22, 875:1-7.  Given that the Planters property was situated to the north of Milford Street, Bouch informed Rivers that the Planters Site also might be contaminated.  Trial Tr. 875:8-10, 873:4-7.

49.    Carter also had a conversation by telephone with Rivers on January 27, 1992, that probably included some discussion about the notice. Trial Tr. 74:18-77:4.

50.    The same day that he spoke to Rivers, Carter called a special meeting of the Ross board of directors, in part, to discuss a "potential environmental liability claim against the Corporation[.]"  Defs.' Ex. 57 at 172; Trial Tr. 77:5-12.  The potential claim was related to the law firm notice.  Trial Tr. 78:9-13.  "The issue," Carter testified, was that a law firm was "asking for plants—companies that did business in the Neck area, so one of them being Planters Fertilizer, so you would think that there was some issue dealing with Planters' ownership of that property."  Trial Tr. 78:22-79:2.

51.    The minutes of the board meeting held on January 31, 1992, reflect that the primary topic of discussion was determining how to respond to a borrower's request for an extension on a promissory note.  Defs.' Ex. 57 at 173-174.

52.    The Ross Directors, however, also authorized  Carter "to consult on behalf of the Corporation with an environmental attorney of his choice concerning environmental matters involving the Corporation."  Pl.'s Ex. 11 at 2; Trial Tr. 81:7-10.  The purpose was to determine if the company might have some environmental liability.  Trial Tr. 381:11-13.  Almost a week later,  Scarborough wrote to  Carter, asking who he had "contacted as an environmental attorney on behalf of the corporation[.]" Pl.'s Ex. 14.

53.     Carter did not follow up on the board's directive to consult with an environmental attorney.  He explained: "No, I don't think I directly did consult with an environmental attorney.  I believe what happened was that Mr. Rivers, after he had spoken to Mr. Bouch, got any information from Mr. Bouch, relayed that to me and the other directors, and no further action was taken." Trial Tr. 81:13-17.

54.    On February 8, 1992, another article was published in the local newspaper that discussed the contamination at the Koppers Site.  Pl.'s Ex. 15, Pl.'s Ex. 16.  The article indicated that creosote could migrate from the Koppers Site by running off the Site and into canals and ditches.  Pl.'s Ex. 16; Trial Tr. 213:3-9.

55.    The article discussed the U.S. Environmental Protection Agency's ("EPA") proposed Superfund designation of the Koppers site but made no mention of the former fertilizer plant site.[3]  Pl.'s Ex. 15.

56.    Carter clipped the article and filed it in his "Ross management special directors' meeting file[.]"  Trial Tr. 211:11-212:10; Pl.'s Ex. 16.  Other board members also saw the article, and the board discussed it.  Trial Tr. 215:3-16, 715:24-716:13.  Carter testified that "in connection with the earlier article" this article "would have raised some questions" about Ross's environmental liability.  Trial Tr. 214:2-3.

57.    After the conversation between Rivers and Bouch, the board made no further inquiries about either the Koppers Site or potential contamination at the Planters property.  Trial Tr. 215:17-216:4.  Ross did not take any steps to determine whether creosote had, in fact, flowed onto the former Planters property.  Trial Tr. 91:22-92:1.  Ross did not retain an environmental attorney.  Trial Tr. 87:16-19.  Ross did not seek advice regarding the environmental laws or its potential liability under them.  Trial Tr. 91:13-19.

58.    Scarborough, who was the board president at the time, did not inform Ross's accountant, Daniell, of the company's potential liability for the Site.  Trial Tr. 386:3-5, 403:10-12.  The special meeting notice, which referenced a potential environmental liability claim, was not provided to Ross's accountant, and the accountant was not otherwise informed of the potential claim.  Trial Tr.  452:6-14.

---

[3] "Commonly used as a synonym for CERCLA, Superfund is formally known as the Hazardous Substance Superfund. It is a federal trust fund that is funded by federal appropriations and a tax on petrochemicals, and is replenished by cost recoveries from [potentially responsible parties]. It is used to pay for government response costs."  47 Am. Jur. Trials 1 *Environmental Law Litigation under CERCLA* § 3.

17

59.    Distributions to the shareholders continued after these events in 1992.  Trial Tr. 92:2-4, 385:24-386:2.

**E. Ross Receives Notice That The Site Is, in Fact, Contaminated - 1998**

60.    On November 12, 1998, another article was published in *The Post and Courier* that discussed the environmental problems at the former Planters property.  Pl.'s Ex. 31.  The article stated that the property was contaminated with lead and arsenic and was being investigated by the EPA.  *Id.*; Trial Tr. 93:24-94:3.  It also specifically identified Planters as a former owner of the Site and quoted the EPA as stating that it had "not yet determined which former property owner will be responsible for the clean up [of the Site.]" Pl.'s Ex. 31; Trial Tr. 93:22-23, 94:11-18.  The costs, the EPA stated, could run "from the tens of thousands of dollars to the millions, depending on whether companies cooperate with the EPA."  Pl.'s Ex. 31; Trial Tr. 94:24-95:3.

61.    Scarborough read the article and sent it to  Carter, who then forwarded it to  Warren and Bailey, Ross's property manager.  Trial Tr. 387:12-20, 95:16-21; Pl.'s Ex. 31.  The board knew from the article that the EPA might hold Ross liable for the clean-up of the Site.  Trial Tr. 96:7-13, 389:17-23, 717:23-718:10, 719:9-21, 234:10-22.

62.    As a result of the newspaper article the "[o]ld Planters site" was put on the agenda for the next board meeting.  Trial Tr. 387:19-388:5.  On December 17, 1998, the board met and authorized Warren and two board members who were attorneys—Scarborough and Carter—"to discuss the matter with an environmental attorney of their choosing."  Pl.'s Ex. 33; Trial Tr. 388:15-19, 389:8-11.

63.   Warren advised the board to get an opinion on Ross's liability from an environmental lawyer.  Trial Tr. 239:1-6, 389:17-23.   Warren also expressly advised the board to get an opinion on whether Ross's liability was "material."  Trial Tr. 239:15-240:4.

64.   Between the board meeting on December 17, 1998, and the annual meetings of the directors and shareholders on February 25, 1999, Scarborough informally consulted his friend and colleague Ben Hagood ("Hagood"), an environmental litigation attorney, to determine whether Ross needed to hire an environmental attorney.  Trial Tr. 389:24-390:17, 393:1-4.

65.   Hagood testified that Scarborough called and asked him a hypothetical "about the situation where someone formerly owned property that may be contaminated, but was no longer an owner, and was there anything that should be done . . . . my understanding was that it was someone who had not received a lawsuit from any private party, had not received a demand or notice from EPA or [S.C. Department of Health and Environmental Control] or any regulatory authorities." Trial Tr. 772:14-18, 773:3-10.   Hagood considered these to be "important facts." Trial Tr. 773:9-10.   Hagood recalled that the gist of his response was that he "did not know of any action that that private owner should be taking at this time." Trial Tr. 775:17-23.

66.   Hagood indicated that the EPA would be persistent once it decided to recover its costs. Hagood told  Scarborough that if the EPA wants to find you, it will find you, and when it does, it will "bring it home to you."  Trial Tr. 399:20-400:10.

67.   Scarborough testified that "the gist of the information that [he] took back to the board was if the EPA is going to come after you, they're going to come after you.  You're going to be

very certain, because they're going to send you a letter and say, hey, you need to clean this place up." Trial Tr. 392:8-12.

68. Even though the EPA had not yet sought to recover its investigation costs from Ross, Hagood did not offer any assurances that the EPA would not ultimately pursue Ross. Trial Tr. 397:9-11, 775:24-776:4.

69. The board knew that it had not retained Hagood, and that Hagood was not advising the board regarding Ross's potential liability for contamination at the Site. Trial Tr. 391:8-10, 999:10-22, 99:22-25. The board understood it was possible Ross would be held liable for contamination at the Site and that the EPA could pursue Ross for response costs. Trial Tr. 100:23-25, 400:14-18.

**F. Ross Becomes Insolvent in 1998**

70. Edwin Ordway, Jr., ("Ordway"), PCS's expert witness in public accounting, finance reporting and analysis, and business valuation, specifically solvency analysis, testified at trial. Trial Tr. 515:14-21. The court found Ordway to be a credible witness.

71. Ordway testified that if a business received notice that it is a potentially responsible party under CERCLA, generally accepted accounting principles dictate that if the company is also associated with a site, then liability for the site is probable, Trial Tr. 523:1-525:12, and a reserve should be set aside if the amount of that liability is reasonably estimable. Trial Tr. 526:18-531:2. Ordway testified that it was his opinion, based on his understanding of accepted accounting principles, that Ross should have set aside a reserve to cover the environmental remediation costs of the Site. Trial Tr. 539:5-9.

72.    Mark Johns ("Johns"), an expert witness called by PCS qualified in remedial costs estimation, environmental remedial analysis, and costs allocation, testified about the estimated remediation costs of the Site.  Trial Tr. 646:5-13.  The court found Johns to be a credible witness.

73.    Johns explained how a board might come up with reasonable cost estimates on the basis of information available to the board at the time it decided to authorize distributions, given the board's previous use of an environmental consultant, complex environmental issues such as wetland delineation, EPA reports, and various local newspaper articles referencing the Site.. Trial Tr. 660:22-664:1; 664:18-665:15.

74.    Johns provided his estimates of the remediation costs predictable at the time of each distribution.  *Id*. at 666:4-670:17.  Johns estimated the reasonably estimable remediation costs at the time of various distributions to be:

   a.    September 1997: $5,483,844.  Trial Tr. 666:9.
   b.    March 1999: $5,477,528.  Trial Tr. 666:23-24.
   c.    June 1999: approximately $5.47 million.  Trial Tr. 667: 5-9.
   d.    May 2002: $6,625,087.  Trial Tr. 667: 668:1-23.
   e.    October 2004: $6,373,874.  Trial Tr. 668:24-669:1.
   f.    August 2005:$7,882,256.  Trial Tr. 669:5-17; Pl.'s 76.
   g.    July 2006: $8,118,724.  Trial Tr. 669:18-25.
   h.    December 2006:  $8,118,724.  Trial Tr. 670:7-13.

75.    At the time of the distributions, Ross's liability for the Site should reasonably have been estimated by the board to be at least forty-five percent of the foregoing estimates of the total remediation costs.

76.    Ordway explained his method of valuing Ross's assets and provided an estimated value of Ross assets on various dates.  Trial Tr. 558:5-559:24.  Ordway presented a solvency analysis he conducted in which he valued Ross's total assets at the date of each distribution and

compared that value to Johns' estimates of Ross's liability for the contamination at the Site. Trial Tr. 559:25-568:19.  Ordway rendered his opinion that Ross was insolvent at each of the times it made a challenged distribution.  Trial Tr. 564:14-565:9; 566:16-568:11.

77.    Ordway calculated the extent of Ross's insolvency on the date of each distribution based on Ross's liability for forty-five percent of the total remediation costs as estimated by Johns. Trial Tr. 564:14-565:9; 566:16-568:11.

78.    Because of its liability for the cost of environmental remediation at the Site, the court finds Ross was insolvent at the time of each of the distributions challenged by PCS.

**G. The Rike Message**

79.    On January 28, 1999,  Rike left a message for  Scarborough and  Carter.  Pl.'s Ex. 38B. Rike called  Carter from the Charleston airport and, when Carter was not available, left a lengthy message with his secretary, Linda Tolan ("Tolan").  *Id.*; Trial Tr. 102:14-17.

80.    Carter testified that he assumed that he received the message that was taken down by  Tolan. Trial Tr. 103:7-8.

81.     Rike wanted to know when the next board meeting would be held and the balances in Ross's various bank accounts. Pl.'s Ex. 38B.  Rike asked  Tolan "to relay to [ Carter] and to Mikell Scarborough that she will be calling Mikell at his home – either this evening or tomorrow" and further asked  Tolan to communicate to  Scarborough that "her thoughts at this point are to completely drain all the accounts, particularly since there is a potential 'threat' from the environmental agency right now."  *Id.*

82.  The message further indicates that Tolan relayed the message to Scarborough by leaving him a message at his home phone number. *Id.* Rike provided Tolan with detailed information on where she could be reached. *Id.*

83.  Three days after Rike asked about Ross's bank account balances, on January 31, 1998, someone totaled up the amounts in Ross's accounts, which contained $1,579,729.01. Pl.'s Ex. 40; Trial Tr. 104:24-105:2.

84.  Rike testified that her reference to draining the accounts was in jest and that she never seriously contended to any board member or at any board meeting that the company accounts should be drained. Trial Tr. 720:19-21, 751:3-12, 412:4-16, 191:22-192:9. Scarborough testified he never received a message and that he and Rike never had a conversation in which Rike suggested the accounts should be drained. Trial Tr. 412:10-14.

85.  However, in the months that followed, the board did not seek to learn which Site owners the EPA would direct to pay for clean-up costs incurred at the Site, and the board authorized two distributions to shareholders: $739,268.00 in March 1999 and $292,123.00 in June 1999. ECF No. 312 (Joint Stipulations). It was the only time, other than in 2006, that the board authorized distributions twice in a single year. *Id.*

**H. Events Leading to the Final Dissolution of Ross - 2006**

86.  In August 2005, the board retained Warren to advise it concerning Ross's dissolution. Pl.'s Ex. 164.

87.  In early 2006—January, February, or March—J. Rutledge Young, Jr. ("Young"), one of the attorneys representing Ashley II, initiated a telephone conversation with Carter. Trial Tr. 110:5-16. He asked Carter if there was any documentation of the terms of the 1966 sale in

the company records. Trial Tr. 111:8-112:4. Carter checked the records he maintained in his law office as secretary of Ross but did not find any documentation of the 1966 sale. Trial Tr. 119:3-11.[4] In his communications with Carter, Young informed him that his client, Ashley II, was not going to sue Ross. Trial Tr. 127:14-16, 182:11-14.

88. As a result of the call from Young, Carter knew that "Ashley . . . was bringing a lawsuit against a party or parties." Trial Tr. 127:3-5. "[B]ecause Planters had owned the Site at one time," he understood that "there was a possibility that [Ross] could wind up [in the suit]." Trial Tr. 127:9-11.

89. Warren, Ross's corporate counsel, was aware of Ashley's efforts to recover response costs at the Site. Trial Tr. 248:1-6, 248:24-249:1. Warren testified that "it was reported to me [that Young] called to say he was – Ashley II was filing litigation over the Planters site." Trial Tr. 248:14-16.

90. In addition to Carter, other directors understood Ross may be facing liabilities related to the Site.

91. Hanahan, a lawyer who was familiar with the litigation process, knew that Ross could be brought into the Ashley litigation. Trial Tr. 971:12-972:11. After learning of Carter and Young's conversation, he attended a hearing in the *Ashley II* litigation at which third-party complaints were discussed. Trial Tr. 990:3-991:17. Hanahan knew that PCS was a defendant in the case, and that PCS could bring Ross into the suit. Trial Tr. 992:18-19, 992:24-993:11.

---

[4] Hanahan testified that a copy of the letter of agreement between Planters and CNC was located in a locked safe containing some of his father's files at his mother's house in December 2010. Trial Tr. 978:20-980:5, 1008:22-1009:15.

92.   Rike also was aware that Ross could be brought into the suit. Rike informed the company accountant, on behalf of the board, that "we want to go ahead and hurry up and get things closed out, because there's a possibility that somebody might be suing us." Trial Tr. 459:11-19.

93.   Warren, too, knew that Ross faced potential liability for the Site from that litigation. Trial Tr. 249:7-8. According to Warren, whether the liability was to Ashley, PCS, or the EPA was not significant. Trial Tr. 249:24-25. According to his understanding, South Carolina law required the board to analyze the company's potential liabilities before making liquidating distributions to shareholders, including liabilities to potential creditors. Trial Tr. 241:16-242:25, 244:7-11, 245:20-246:5, 250:1-23, 251:2-9, 570:3-7; Defs.' Ex. 1.

94.   In connection with those distributions, the board was required to "analyze any potential liability[.]" Trial Tr. 242:20-25. Warren specifically advised the board that it needed to evaluate the company's potential liability for the Site before making distributions to the shareholders. Trial Tr. 245:20-246:5, 250:3-23.

95.   As of July 12, 2006, Ross still retained approximately $700,000.00 in assets. Pl.'s Ex. 91. Ross did not set aside these funds until liability for the Site was resolved in *Ashley II*. At a special meeting held on July 12, 2006, the board authorized a "final liquidating distribution" to shareholders at $18.00 a share. *Id.*

96.   After that meeting was held, and before the distribution was actually made, Warren advised the board regarding claims that could be brought against Ross after it dissolved. Pl.'s Ex. 93; Trial Tr. 259:5-260:6.

97.  A July 20, 2006 memorandum drafted by his law firm addressed "whether you gave notice to known creditors, whether you filed a notice in the paper, what the effect was, but it also dealt with distributions[.]" Trial Tr. 259:14-19.  The memo advised the board that claims could be brought against the company within either five or ten years of the date of publication of the newspaper notice of Ross's dissolution.  Pl.'s Ex. 93 at 1-2.  The amount of time that a claimant had to sue depended on the nature of the claim.  *Id.*  The memorandum advised that creditors who could bring claims against the company included "the owner" of "a right of action against the corporation either in contract or in tort[.]"  *Id.* at 3.

98.  On July 25, 2006, on the advice of Ross's counsel, Warren, Carter finalized a memorandum to shareholders advising them that distributions made by the board in July 2006 might have to be returned to Ross's creditors.  Pl.'s Ex. 95 at 2; Trial Tr. 125:6-25, 253:15-21.

99.  The memo informed the shareholders that the "distribution is in final dissolution of the Corporation[.]" Pl.'s Ex. 95 at 2.  It further advised the shareholders of claims that could be brought against the company:

> South Carolina law provides that anyone who has a claim against a liquidating corporation and was not provided with written notice of the dissolution of the corporation may bring a claim within ten years of publication of notice of dissolution.  If the claim is found to be valid, a shareholder of the dissolved corporation is liable for a prorata share of such claim, not exceed[ing] the amount distributed to the shareholder in liquidation.

*Id.*

100.  The memorandum was included with the final distribution made to shareholders.  Ross's bookkeeper, Joey Basha, made the distribution of $659,552.19 to shareholders on or about

July 25, 2006. Pl.'s Ex. 95; ECF No. 312 (Joint Stipulations). The board did not set aside any funds to address Ross's liability for the Site. The money that remained in Ross's bank account, approximately $35,000.00, was moved to an escrow account held by Warren. Trial Tr. 128:11-20. Those funds were "kept just for any final expenses[.]" Trial Tr. 128:14.

101. The board published notice of Ross's dissolution in *The Post and Courier* on September 5, 2006, to ensure that known and unknown creditors were aware of Ross's liquidation. Defs.' Ex. 7; Trial Tr. 988:16-989:3.

102. The notice stated that claims could be brought against Ross after it dissolved, but indicated, inconsistent with the advice Warren's firm had provided to the board, that claims had to be filed against Ross within five years of the date notice was published. Defs.' Ex. 7; Trial Tr. 988:20-989:21. The memorandum prepared by Warren's firm indicated that some claims could be brought against the company as long as ten years after notice of dissolution was published. Pl.'s Ex. 93 at 1-2. The board informed the shareholders that some claims may be governed by a ten year statute of limitations, but did not include that information in the dissolution notice published in the newspaper.

103. Ross filed its articles of dissolution with the South Carolina Secretary of State on September 13, 2006. Defs.' Ex. 6; Trial Tr. 180:13-18. Its dissolution became effective when the articles were accepted for filing. Defs.' Ex. 6 at ¶ 7; Trial Tr. 179:14-18.

104. No evidence indicates that the shareholders exchanged their shares, in the form of redemptions, for any distribution that they received. Edwin Ordway, Jr., PCS's expert in accounting matters, testified that Ross's financial statements indicate that no share redemption occurred:

> [T]he accounting is that they're distributing income that they earned. So it would have been deducted from retained earnings in terms of the financial presentation . . . . [T]hat means they're distributing income . . . .There's not a redemption here. Redemption is when someone owns stock and you're paying them to get the stock back from them. These weren't redemptions, these were liquidating dividends.

Trial. Tr. 570:13-22.

105.    The shareholders' equity in the company did not decline over time. *Compare* Defs.' Exh. 1 PCS-Ordway 002423 *with* Defs.' Exh. 1 PCS-Ordway 002493. Ross did not receive redeemed shares from the Ross Shareholders in exchange for the distributions made to the Ross Shareholders.

**I. The *Ashley II* Litigation And The Final Shareholder Distribution**

106.    PCS moved for leave to bring claims against Ross in the Ashley litigation on November 30, 2006. *Ashley II*, ECF No. 46. The board learned of PCS's motion the same day. Trial Tr. 724:13-14, 129:20-22. The motion sought to recover response costs from Ross and set forth PCS's concern that the board dissolved Ross "with the intent to evade the liabilities associated with the [Site] operations described above." Defs.' Ex. 26 at ¶8; Trial Tr. 1018:17-1019:5.

107.    The board asked Warren to retain litigation counsel for Ross. Trial Tr. 255:10-18. Warren spoke to an environmental lawyer about undertaking that role on December 12, 2006. Trial Tr. 255:19-21.

108.    The board had knowledge that there had been a motion by PCS to amend its lawsuit to bring in Ross and nonetheless distributed the last $35,429.61 of Ross's funds from the escrow account managed by Warren to the Ross Shareholders. Trial Tr. 255:25-256:5, 129:23-130:6, 725:12-726:7; ECF No. 312 (Joint Stipulations).

109. No funds were set aside to either pay for Ross's defense in the Ashley litigation or to address Ross's liability for the Site.  Trial Tr. 130:3-6, 726:4-7, 256:3-5.

110. Warren advised Carter that the monies distributed might have to be disgorged by shareholders to pay PCS: "I told him there was a chance that it could have to – since they were now actually brought into the litigation, that there was a chance that would have to be given back by the shareholders, if Ross were found liable in that litigation." Trial Tr. 257:2-6, 256:6-15.

111. As noted above, in the latter part of 2006, Rike informed the company accountant, on behalf of the board, that "we want to go ahead and hurry up and get things closed out, because there's a possibility that somebody might be suing us."  Trial Tr. 459:11-19.   Daniell understood that  Rike wanted to "speed up the dissolution of the company."  Trial Tr. 459:23-25.

112. There was an issue at trial as to when this conversation occurred.  At trial, Rike testified that this conversation occurred in December 2006.  Trial Tr. 722:21-723:8.  Daniell testified that the conversation occurred in "the latter part of the year."  Trial Tr. 459:15.

113. Rike had no reason to urge Daniell to "hurry up and get things closed out" after the final distribution in December 2006 because by then Ross had been dissolved and the last money had been distributed.  Daniell testified that Rike instructed him to speed things up in view of "a possibility that someone might be suing us,"  Trial Tr. 459:16-19, but by December 2006 the board already knew that Ross was being sued by PCS.  The court finds that this conversation between Rike and Daniell occurred prior to the final shareholder distribution

of December 16, 2006 and evidences Rike's intent that Ross deplete its assets with a view to avoiding any liability associated with the *Ashley II* litigation.

114.   Michael Brom ("Brom"), a corporate employee of PCS, testified that PCS received discovery from Ross as part of the *Ashley II* lawsuit, including production in February of 2007 of about 300 pages of documents, including Ross's financial statements. Trial Tr. 336:23-338:20. Brom testified that a further 20,000 pages of documents or so were produced to PCS in 2008. Trial Tr. 343:3-16.

115.   Brom testified that PCS deposed Rike in 2007 and again in 2010.  Trial Tr. 339:10-20; 345:2-4.

116.   Rike's testimony at trial included substantial discussion of what she did, and did not, say during her February 2007 deposition by PCS.  Trial Tr. 727:17-732:14; 748:18-750:10.

117.   The 1998 *Post and Courier Article* was not produced to PCS until sometime in 2008.  Trial Tr. 343:3-15.

118.   PCS commenced this action on December 8, 2009.  ECF No. 1.

**J. PCS Was a Potential Future Creditor of Ross At the Time of the Distributions**

119.   Liability for remediation at the Site has been apportioned among potentially responsible parties, and Ross's share of that liability is forty-five percent.  Trial Tr. 308:3-16.

120.   At trial, Brom  testified that PCS was:

> actually out there . . . now cleaning up the site and doing stuff to prepare . . . for the trucks to move dirt.  And we have a survey crew out there this week . . . we are moving forward. We've spent significant amounts of money to . . . [develop] the initial plans that we put together, and . . . we are moving forward with cleanup at the Planters site.

*Id*. at 291:13-292:2.

121.    As noted *supra* ¶ 3, the original sale of the Site from Planters to CNC was governed by a letter of agreement containing an indemnification clause in which Planters agreed to indemnify CNC "in respect to any acts, suits, demands, assessments, proceedings and costs and expenses resulting from any acts of [Planter's] occurring prior to the closing date . . . ."  Pl.'s Ex. 3; Trial Tr. 124:2-17.

122.    PCS incurred litigation costs as a defendant in connection with the *Ashley II* CERCLA lawsuit.  Trial Tr. 348:2-13.

123.    The court finds that PCS was a potential future creditor of Ross at the time of each of the challenged distributions, based on the indemnification contract and Ross's liability under CERCLA.

## II. CONCLUSIONS OF LAW

### A. Ross's Affirmative Defenses

The Ross Defendants assert several affirmative defenses in their answer.  ECF No. 53.  Of these, however, only two—the statute of limitations and laches—were argued to the court during the hearing held on Defendants' oral motion for summary judgment on PCS's fraudulent conveyance claim.  *See* ECF No. 343.  Ross must prove these defenses by a preponderance of the evidence.  *Lorick & Lowrance, Inc. v. Julius H. Walker & Co.*, 150 S.E. 789, 792 (S.C. 1929) ("When a defendant interposes an affirmative defense, he becomes as to that matter the actor in the suit, and burden of proof rests upon him to establish his affirmative defense by preponderance of the evidence.").  For the reasons below, the court concludes these defenses do not bar PCS's claim against the Ross Shareholders or Ross Directors.

### 1. Statute of Limitations

"An action to set aside a conveyance under the Statute of Elizabeth is an equitable action" and was cognizable only by the court of chancery before the merger of the courts of law and equity. *See Oskin v. Johnson*, 735 S.E. 2d 459, 463 (S.C. 2012). Thus, the relevant statute of limitations is established in S.C. Code Ann. § 15–3–530(7), which provides that a three years statute of limitations is applicable to:

> any action for relief on the ground of fraud in cases which prior to the adoption of the Code of Civil Procedure in 1870 were solely cognizable by the court of chancery, the cause of action in the case not considered to have accrued until the discovery by the aggrieved party of the facts constituting the fraud.

S.C. Code Ann. § 15–3–530(7); *see also In re J.R. Deans Co., Inc.*, 249 B.R. 121, 132 (Bankr. D.S.C. 2000) (applying the three year statute of limitations of § 15–3–530(7) to an action under the Statute of Elizabeth). The statute of limitations for an action under the Statute of Elizabeth is governed by the "discovery rule." *Burgess v. The Am. Cancer Soc'y,* 386 S.E.2d 798, 799 (S.C. Ct. App. 1989) (citing *Grayson v. Fidelity Life Ins.,* 103 S.E. 477 (S.C. 1920)). The discovery rule provides that the statute of limitations "does not begin to run until discovery of the fraud itself or of 'such facts as would have led to the knowledge thereof, if pursued with reasonable diligence.'" *Id.*; *see also In re J.R. Deans Co., Inc.*, 249 B.R. at 132 (applying the discovery rule to an action to set aside a fraudulent conveyance).

Ross argues that PCS knew about its potential claim under the Statute of Elizabeth by November 30, 2006—at the latest—when PCS filed a motion to amend the third party complaint in the *Ashley II* litigation. In that filing, PCS alleged that Ross filed its Articles of Dissolution with the Secretary of State "with the intent to evade the liabilities associated with the operations" of its

fertilizer plant on the Site. *Ashley II*, ECF No. 71-2 at 14. According to Ross, the statute of limitations ran on or about November 30, 2009, more than a week before PCS filed the complaint in this action. *See* ECF No. 1 (Complaint). PCS contends that it only learned that the shareholder distributions were fraudulent conveyances in 2008, when Ross produced a copy of the 1998 article about the Site which revealed to PCS that Ross knew of its potential liability for the Site and yet continued to make shareholder distributions notwithstanding. PCS asserts that only then did it become aware the Ross Directors made distributions while aware of its potential liability for the Site and, therefore, arguably with the intent to frustrate future creditors.

The court concludes that Ross has not shown that PCS discovered or should have discovered that this cause of action was available to it more than three years before this action was commenced on December 8, 2009. One phrase in PCS's motion for leave to amend its complaint in 2006 in the *Ashley II* litigation is insufficient evidence standing alone to have begun the running of the statute of limitations. Given the timeline of discovery established at trial, *supra* ¶¶ 106-118, the court concludes that it is more likely than not that PCS did not discover the availability of this cause of action until Ross's first document production of February 10, 2007, until Rike's first deposition on February 16, 2007, or, as PCS argued, until Ross's second document production in 2008. This action is, therefore, timely

### 2. Laches

Defendants also have asserted a laches defense. "[L]aches arises upon the failure to assert a known right under circumstances indicating that the lached party has abandoned or surrendered the right." *Brown v. Butler*, 554 S.E.2d 431, 434 (S.C. Ct. App. 2001) (internal quotation and citation omitted). "Delay alone [in asserting a right] is not enough to constitute laches; it must be

unreasonable, and the party asserting laches must show prejudice." *Id.* If a claim is filed within the applicable limitations period, laches cannot be found unless a heightened burden is satisfied. Where, as here, PCS filed the claim within the limitations period, Defendants must prove that "the delay in filing suit was accompanied either by a failure on the [plaintiff's] part to perform a legal duty or by a negligent act on [its] part that misled [defendants] to the extent that it would be inherently unfair to allow [plaintiff] to proceed on [its] cause of action." *Id.* at 435. The documents indicating that the Ross Directors knew of Ross's potential liability for the Site, i.e., the various *Post and Courier* articles, were produced to PCS in 2008. ECF No. 343 at 49:15-17. PCS filed this action in December 2009. ECF No. 1. Ross produced no evidence that PCS failed to perform a legal duty or committed a negligent act in bringing this lawsuit when PCS did; therefore, Ross has not demonstrated prejudice. The court concludes that Defendants have failed to prove the defense of laches.

### 3. *Equitable Estoppel*

Equitable estoppel is "the inhibition to assert such right by reason of mischief following one's own fault and may arise even though there was no intention on the part of the party estopped to relinquish or change any existing right. Prejudice to the other party is an essential element of equitable estoppel." *Janasik v. Fairway Oaks Villas Horizontal Property Regime*, 415 S.E.2d 384, 387 (S.C. 1992). With regard to the party estopped, the elements of equitable estoppel are: (1) conduct amounting to a false representation or concealment of material facts, "or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;" (2) the intention or expectation that such conduct shall be acted upon by the other party; and (3) actual or constructive knowledge of the real facts.

*Rushing v. McKinney*, 633 S.E.2d 917, 924 (S.C. Ct. App. 2006) (quoting *S. Dev. Land & Golf Co. v. S. Carolina Pub. Serv. Auth.*, 426 S.E.2d 748, 750 (S.C. 1993)). "As related to the party claiming the estoppel, the essential elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position." *Rushing*, 426 S.E.2d at 924. Here, the facts do not show that PCS's conduct amounted to a false representation or concealment of material facts. Further, the facts do not show that Defendants relied upon the conduct of PCS in making the distributions. Indeed, evidence at trial demonstrated that Defendants were aware that at least some of the distributions made in 2006 may be subject to clawback provisions based on potential liability. *See supra* ¶¶ 89-93. The court concludes that equitable estoppel does not bar PCS's fraudulent conveyance claim.

### 4. Waiver

Under South Carolina law, "[a] waiver is a voluntary and intentional abandonment or relinquishment of a known right." *See Janasik*, 415 S.E.2d at 387-88. "Generally, the party claiming waiver must show that the party against whom waiver is asserted possessed, at the time, actual or constructive knowledge of his rights or of all the material facts upon which they depended." *Id.* The facts presented at trial fail to demonstrate a voluntary waiver by PCS of its fraudulent conveyance claim. Before 2006, PCS did not have knowledge of all the material facts at issue, including the fact that the Ross Directors may have known about potential environmental liability but continued making distributions to the Ross Shareholders. Therefore, waiver does not bar PCS's fraudulent conveyance claim as PCS has diligently pursued its claims, negating any inference that it intended to relinquish its claim.

35

**B. The Statute of Elizabeth**

Having concluded that PCS's claim is not barred by either the statute of limitations or laches, the court next turns to the question of whether PCS has stated a claim that, as a legal matter, is cognizable under the Statute of Elizabeth. That statute provides the following:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27–23–10(A).

*1. Cash Transfers May Be Voided under The Statute of Elizabeth*

Ross contends that cash transfers are not covered by the Statute of Elizabeth and, therefore, that the transfers to the Ross Shareholders and Directors are not voidable. Conveyances of cash are, admittedly, not expressly referenced in the Statute of Elizabeth. S.C. Code Ann. § 27–23–10(A). However, the South Carolina Supreme Court does not view the listing of various specific types of property in the statute as prohibitive. *See Avery v. Wilson*, 25 S.E. 286, 294 (S.C. 1896) (holding that the omission from the Statute of Elizabeth as then written "of the words 'goods and chattels' did not enable debtors to practice frauds as to 'goods and chattels' any more than they could as to any other property."). In *Fabrica la Estrella S.A. de C.V. v. Banda*, 6:06-466-HMH, 2007 WL 39428 (D.S.C. Jan. 4, 2007) (unpublished), this court voided a cash transfer of $300,000.00 under

the Statute of Elizabeth.  In deciding the issue, the court held that "[b]ased on the broad language and equitable nature of the Statute . . . the transfer of funds . . . is a 'transfer' under the broad and plain language of section 27-23-10(A)."  *Id.* at *3 (citation omitted).  Other courts in this district reached analogous conclusions.  *See In re Hanckel*, 512 B.R. 539, 551 (Bankr. D.S.C. 2014) (finding an ownership interest in a company subject to the statute and setting aside its transfer as a fraudulent conveyance); *In re Hoffman*, 194 B.R. 943, 959-61 (Bankr. D.S.C. 1995) (holding transfers of cash totaling $323,500.00 made by a debtor to an insider creditor's company void under the statute); *Future Grp., II v. Nationsbank*, 478 S.E.2d 45, 49 (S.C. 1996) (finding guarantees of corporate debt subject to the statute and affirming their voidness as fraudulent conveyances). The court concludes that cash transfers such as the distributions from Ross to the Ross Directors and Shareholders are voidable as fraudulent conveyances under the Statute of Elizabeth.

## *2. PCS Need Not Establish a Definite Debt Amount to Recover under the Statute of Elizabeth*

Ross has also argued that PCS may not set aside conveyances under the Statute of Elizabeth where PCS has not established the precise amount of the underlying debt.  *See, e.g.*, ECF No. 343 at 12-13 ("PCS has not established its ability to set aside the conveyance in any amount because it didn't prove at trial that it's owed monies from Ross in any particular amount.").  Federal Rule of Civil Procedure 18(b) and South Carolina Rule of Civil Procedure 18(b) allow actions for recovery of a debt and fraudulent conveyance to proceed contemporaneously, rather than previously where a creditor was required to obtain a return *nulla bona* before commencing an action to set aside a fraudulent conveyance.  *See also Lebovitz v. Mudd*, 358 S.E.2d 698, 700-01 (S.C. 1987) (holding that once Rule 18(b) went into effect, no creditor suing under the Statute of Elizabeth needs to

reduce debt to a judgment and obtain a return *nulla bona* before bringing suit). Ross argues that, nonetheless, PCS is required to prove the exact amount owed to it by Ross before it can be successful in a fraudulent conveyance action. The court disagrees.

In this case, PCS has established the existence of a debt owed to it by Ross. At trial, PCS moved into evidence the indemnity contract between Ross and PCS and elicited testimony about this court's allocation of response costs in the *Ashley II* litigation and the estimated costs of remediating the Site. *Supra* ¶¶ 3, 5-8. Further, the jury necessarily found that Ross owed a debt to PCS when it returned a verdict in favor of PCS on its breach of fiduciary duty claim. *See* ECF No. 316 at 7 (jury instructions) ("If you find that [PCS] was a creditor of Ross Development Corporation at time [of insolvency], then the Ross Directors each owed fiduciary duties to [PCS]."). The exact amount of the debt Ross owes PCS cannot, of course, be known until 1) the Site is remediated and the total amount of response costs are known and are apportioned in accordance with this court's order in the *Ashley II* litigation, and 2) this court determines the amount owed to PCS under the indemnification contract, a matter currently the subject of litigation between Ross and PCS in the remaining unresolved issue from *Ashley II*. Finally, the court notes that to accept Ross's view would be to require PCS to re-litigate the fraudulent conveyance claim after the complete remediation of the Site and would necessitate a second trial where the parties would be required to present evidence almost identical to that presented during the proceedings recently concluded. The court declines to require such an expenditure of resources. The court concludes PCS has established that it is a creditor of Ross's and, as such, may challenge the fraudulent conveyances at issue in this case, notwithstanding that the exact amount of the debt Ross owes to PCS remains unknown.[5]

---

[5] Ross also argues that if a debtor retains sufficient assets to satisfy the debt in full, a challenged conveyance will not be set aside. *See Albertson v. Robinson*, 638

Having concluded that the transfers challenged by PCS are voidable under the Statute of Elizabeth, the court turns next to the question of which party bears the burden of proof.

## C. The Burden of Proof

Section 27–23–10 extends its protections not just to judgment creditors, but to other types of parties defrauded in connection with conveyances. In South Carolina, fraudulent transfers may be set aside by existing as well as subsequent creditors. *In re J.R. Deans Co., Inc.,* 249 B.R. at 130. PCS is a subsequent creditor or an "other" protected by the statute. Subsequent creditors may have conveyances set aside when "(1) the conveyance was 'voluntary,' that is, without consideration, and (2) it was made with a view to future indebtedness or with an actual fraudulent intent on the part of the grantor to defraud creditors." *Judy v. Judy*, 742 S.E.2d 672, 675 (S.C. Ct. App. 2013). "Subsequent creditors must show 'actual moral fraud,' rather than legal fraud." *Id.* at 266. Actual moral fraud involves "a conscious intent to defeat, delay, or hinder [one's] creditors in the collection of their debts." *Id.*

The two prongs of the subsequent creditor standard are conjunctive. A plaintiff must establish both to prevail. *In re Ducate*, 369 B.R. 251, 259 (Bankr. D.S.C. 2007). A clear and convincing evidentiary standard governs fraudulent conveyance claims brought under the Statute

---

S.E.2d 81, 84 (S.C. Ct. App. 2006). The sufficiency of assets is not, however, measured at the time of the transfer, but rather at the time when the creditor is able to collect its debt in full. *Gardner v. Kirven*, 191 S.E. 814, 816 (S.C. 1937) ("Where a conveyance is made . . . it is said that the conveyance will stand if the grantor reserves a sufficient amount of property to pay his creditors. But this means a sufficient amount of property not merely at the time of the transfer, but an amount from which in the *final analysis* the creditors are able to collect their indebtedness in full.") (emphasis added). Ross is a dissolved corporation and has no assets to satisfy any debt. *Supra* ¶¶ 93, 96. Any conveyances found to be fraudulent by the court may be set aside only to the extent necessary to satisfy the debt owed PCS, an amount yet to be determined with precision.

of Elizabeth, meaning that a plaintiff usually must prove both prongs by clear and convincing evidence. *Oskin*, 735 S.E.2d at 463.

However, there is an exception to this burden of proof in instances of voluntary transfers to family members. Specifically, "[w]here transfers to members of the family are attacked either upon the ground of actual fraud or on account of [lack of consideration], the law imposes the burden on the transferee to establish both a valuable consideration and the bona fides of the transaction by clear and convincing testimony." *Gardner v. Kirven*, 191 S.E. 814, 816 (S.C. 1937); *see also In re J.R. Deans Co., Inc.*, 249 B.R. 121, 134 (Bankr. D.S.C. 2000) (quoting *First Union Nat'l Bank of N. Carolina*, 445 S.E.2d 457, 458 (S.C. Ct. App. 1994)). For the reasons below, the court concludes that Ross bears the burden of proving by clear and convincing evidence that the distributions to the Ross Directors and Shareholders were made for valuable consideration and that the transactions were bona fide.

Ross argues that it would be inappropriate to shift the burden of proof in this case because during the relevant time period some of the Ross shareholders were not members of the Hanahan family and, therefore, distributions were made to both family and non-family members. In such a case, the court can properly decline to shift the burden of poof. *See In re Dreiling*, 233 B.R. 848, 875 (Bankr. D. Colo. 1999) (declining to shift the burden of proof where there "was a transfer to family members . . . but there was also a transfer to non-family members . . ."). However, all of the challenged transfers were made to members of the Hanahan family. *Supra* ¶¶ 14-18. This case is not, therefore, one where the transferees are a mix of family and non-family where the court could properly decline to shift the burden of proof.

40

Ross also asks the court to interpret various South Carolina fraudulent conveyance cases to stand for the rule that the burden of proof will only be shifted when the challenged transfers are made to immediate family members of the debtor. Indeed, the cases where South Carolina courts have shifted the burden of proof do most commonly involve transfers to immediate family members. *See*, *e.g.*, *Robbins v. Dinkins*, 35 S.E.2d 697 (S.C. 1945) (sibling relationship); *Gardner v. Kirven*, 191 S.E. 814 (S.C. 1937) (parent-child and husband-wife relationships); *Epworth Orphanage v. Strange*, 146 S.E. 414 (S.C. 1929) (parent-child relationship); *S. Carolina Nat'l Bank v. Halter*, 359 S.E.2d 74 (S.C. Ct. App. 1987) (husband-wife and parent-in-law-child-in-law relationships). The court declines, however, to create such a rule. In the first instance, the application of an "immediate family" test would require courts to engage in line drawing as to what constitutes "immediate family." Any definition cabining itself only to parents, children, spouses, and siblings would be under-inclusive in that one can imagine close family relationships between more extended family members. Such a rule may also give arbitrary protection to transfers made to, for instance, a cousin, while capturing a similar transfer made to a spouse. Further, the South Carolina Supreme Court held simply that "where transfers to members of the family are attacked" the burden shifts to the family member transferee. *Gardner*, 191 S.E. at 816; *see also First State Sav. & Loan Ass'n v. Nodine*, 354 S.E.2d 51, 54 (S.C. Ct. App. 1987) (shifting the burden where a conveyance is to "a family member or close relative"). The court declines to use the case at bar as a vehicle to impose additional limitations on the rule as stated by the state Supreme Court.[6]

---

[6] Even if the court were to adopt an "immediate family" member test, it is not entirely clear that such a test would prevent the burden from shifting to the transferees in this case. At least some of the Ross Shareholders are the immediate family members of the Ross Directors and even under Ross's formulation might still have to bear the shifted burden of proof. *Supra* ¶¶ 16-17.

Finally, Ross urges the court not to shift the burden of proof because the transfers at issue in this case did not emanate from members of the Hanahan family, but rather, from Ross, a privately-held corporation.  However, the court can shift the burden of proof when the challenged transfer is from a corporation if the court concludes that the transfer was "in reality" an intra-family transfer.  In *Windsor Properties, Inc. v. Dolphin Head Constr. Co., Inc.*, 498 S.E.2d 858, 861 (S.C. 1998), the South Carolina Supreme Court approved the shifting of the burden of proof where the challenged transfer was a transfer of real property from a husband's wholly-owned corporation to his wife.  *Id.* at 859.  The wife in that case testified that, to her, her husband and his wholly-owned corporation "were the same." *Id.* at 861 n.4.

Similarly, in *In re Southern Textile Knitters*, 65 F. App'x 462, 437 (4th Cir. 2003), the challenged conveyance was the salary and commission paid to the sister of the president and founding shareholder of a closely-held family-owned corporation.  *Id.* at 429-30.  The corporation was owned by four family members: the president and his mother, father, and brother.  *Id.*  The sister was an employee of the corporation.  *Id.*  The Fourth Circuit concluded that to not shift the burden of proof in such a case under the Statute of Elizabeth would be to "[stand] this cause of action on its head." *Id.* at 437.

Here, Ross and its directors and shareholders are situated similarly to the corporate transferors and family member transferees in *Windsor Properties* and *Southern Textile Knitters*.  Notwithstanding the fact that Ross observed appropriate corporate formalities, the court concludes that the transfers from Ross to the Ross Directors and Shareholders are "in reality intra-family transfers." *Windsor Properties*, 498 S.E.2d at 861; *see also Southern Textile Knitters*, 65 F. App'x at 432, 438 (refusing to pierce the corporate veil and nonetheless shifting the burden of proof with

42

respect to conveyances to a family member transferee).  The court concludes the burden is on the Ross Defendants to "establish both a valuable consideration and the bona fides of the transaction by clear and convincing testimony" in order to disprove PCS's claim that the distributions from Ross were fraudulent conveyances.[7]  *See Gardner*, 191 S.E. at  816.

**D. The Challenged Conveyances**

PCS challenges the distributions Ross made to the Ross Directors and Shareholders from 1999 to the final dissolution of the corporation in 2006.  These distributions total $4,582,163.90.  *See* Appendix A.  For the reasons set forth below, the court concludes Ross has failed to show by clear and convincing evidence that the distributions were made for valuable consideration, nor has Ross shown the bona fides of the transaction.

*1. Valuable Consideration Was Not Exchanged for the Distributions*

Although  the Ross Directors and Shareholders would have been entitled, in normal circumstances, to liquidating distributions from Ross upon its dissolution, *see* S.C. Code Ann. § 33-14-105 (governing the distribution of the assets of a dissolved corporation), the jury in this case already made a finding that the shareholders were not entitled to the distributions at issue here.  Because the jury found that Ross's creditors, such as PCS, rather than the Ross Directors and Shareholders, were entitled to Ross's assets after the point Ross became insolvent, the court refuses to hold that the distributions to the Ross Directors and Shareholders should be deemed to have been

---

[7] One of the Ross Shareholders is the Trust of William O. Hanahan, Jr.  Appendix A. This trust was established by the father of Ross Director William O. Hanahan, III. Trial Tr. 969:22-970:18.  Hanahan and his two sisters were the beneficiaries of the trust.  *Id*.  The court concludes that transfers from Ross to the Trust of William O. Hanahan, Jr., were "in reality" intra-family transfers from Hanahan to himself and his two sisters.  *See Windsor Properties*, 498 S.E.2d at 861.

for valuable consideration simply on the basis of the status of the Ross Directors and Shareholders as shareholders.

Additionally, the court concludes that the Ross Directors and Shareholders did not present sufficient evidence to allow the court to find that the distributions were made in exchange for the redemption of outstanding shares. While under Ross's amended plan of liquidation it was possible that distributions could be made "in return for the surrender by such [s]hareholders of a portion of their stock in the company," *supra* ¶ 37, there was no evidence presented that such a surrender ever occurred. There was no evidence that any shares were surrendered or redeemed. No shareholder or board member testified to any surrender or redemption of stock, and both expert testimony presented by PCS and Ross's own financial statements establish that no such surrender or redemption occurred. *Supra* ¶¶ 97-98. If the shareholders were surrendering shares in exchange for the distribution, the number of outstanding shares would decline over time. That did not occur. The court concludes that the Ross Directors and Shareholders did not receive the distributions as consideration for the redemption of their shares.

The court concludes that the distributions to the Ross Directors and Shareholders were made without consideration and are, accordingly, void under the Statute of Elizabeth.

### 2.  Ross Has Not Proved the Bona Fides of the Distributions

The Ross Directors and Shareholders are also unable to demonstrate the bona fides of the transaction. Ross was on notice as early as 1992 that there may have been potential environmental liability associated with the company's past operation of a fertilizer plant at the Site. Members of the board learned from an advertisement in the local newspaper that property near the Site was contaminated. *Supra* ¶¶ 45-46. The board held a special meeting to discuss, in part, a "potential

44

environmental liability claim against the Corporation." *Supra* ¶ 51. In conjunction with a subsequent article also seen by board members, questions were raised as early as 1992 about Ross's environmental liability. *Supra* ¶¶ 55-57.

In 1998, the Ross board learned that the Site was, in fact, contaminated and was being investigated by the EPA. *Supra* ¶ 61. The board understood that it was possible that Ross would be held liable for the contamination at the Site and that the EPA could pursue Ross for response costs. *Supra* ¶ 71. Ross Director Rike called her fellow directors Carter and Scarborough to communicate that her thoughts were "to completely drain all the accounts, particularly since there is a potential 'threat' from the environmental agency right now." *Supra* ¶ 74. Although Rike suggested her comment was in jest, the board authorized two distributions to shareholders following her message. It was the only time other than in 2006 that the board authorized distributions twice in a single year. *Supra* ¶ 78.

Carter learned in early 2006 that there was ongoing litigation concerning the Site and that Ross could be sued and be held liable for contamination at the site. *Supra* ¶¶ 80-81. Directors Hanahan and Rike and corporate counsel Warren also knew Ross could be brought into the litigation. *Supra* ¶¶ 83-86. Even though the board of directors knew Ross could face liability for the Site, they authorized a distribution to shareholders in July 2006. *Supra* ¶ 88.

PCS brought Ross into the *Ashley II* litigation on November 30, 2006. *Supra* ¶ 99. The next day, the board authorized the last distribution to shareholders. *Supra* ¶ 101. Before this point, sometime in the latter part of 2006, Rike informed the company accountant that "we want to go ahead and hurry up and get things closed out, because there's a possibility that somebody might be suing us." *Supra* ¶¶ 85, 104-06. The company accountant, Daniell, who regularly provided Ross

with audited financial statements during this period, was never informed of any potential environmental liability claim against Ross. *Supra* ¶¶ 34, 59.

The chronology of events adduced at trial undermines Ross's argument that the distributions were bona fide transactions. *See Mathis v. Burton*, 460 S.E.2d 406, 408 (S.C. Ct. App. 1995) (stating the intent of a transferor "is partially evidenced by the chronology of events"). Here, the evidence shows that the board knew of the potential liability associated with the Site and nonetheless continued to make regular and substantial distributions to shareholders. Furthermore, whenever the "threat" seemed particularly acute, as it did after the 1998 article or after the beginning of the *Ashley II* litigation in 2006, the board responded by accelerating the tempo of distributions to shareholders, making two distributions in each 1999 and 2006. Ross failed to prove by clear and convincing evidence that the distributions to shareholders were bona fide transactions and not, in reality, transfers designed to defeat the known potential claims of Ross's subsequent creditors.

The Ross Directors and Shareholders have not shown that the distributions were made for valuable consideration, nor have they shown the bona fides of the distributions. The court concludes, therefore, that all of the challenged distributions from 1998 to 2006, as detailed in Appendix A, are fraudulent conveyances and void under the Statute of Elizabeth.

**E. Remedy**

In its Amended Complaint, PCS asks the court to issue a declaratory judgment declaring the fraudulent conveyances void and to impose a constructive trust upon all Ross property found to be improperly transferred. ECF No. 34 at 20. With respect to the former remedy, in keeping with the foregoing findings of fact and conclusions of law and pursuant to 28 U.S.C. § 2202, the distributions made to the Ross Directors and Shareholders between 1998 and 2006 are declared void.

With respect to the latter remedy, an action to declare a constructive trust is in equity. *Lollis v. Lollis*, 354 S.E.2d 559, 561 (S.C. 1987). "A constructive trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by the one holding the legal title." *Id.* A constructive trust results from fraud giving rise to "an obligation in equity to make restitution." *Id.* The court concludes that PCS has not shown its entitlement to a constructive trust.

First, the focus of the constructive trust remedy is on the culpability of the current holders of the property at issue, i.e. the Ross Shareholders and Directors. "A constructive trust arises whenever a party has obtained money which does not equitably belong to him . . . ." *SSI Med. Servs., Inc. v. Cox¸* 392 S.E.2d 789, 793-94 (S.C. 1990). The constructive trust operates "against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of a wrong or by any form of unconscionable conduct, artifice, concealment, or questionable means and against good conscious, either has obtained, or holds the right to property, which he ought not in equity and good conscience hold and enjoy." *Doe v. Roe*, 475 S.E.2d 783, 786-87 (S.C. Ct. App. 1998). In the fraudulent conveyance cause of action, the focus is on the wrongdoing of the transferors, in this case, the Ross Directors. For a constructive trust to arise, the transferee must also be a wrongdoer. Here, the evidence does not support a finding that the Ross Shareholders acted with any wrongful intent or perpetrated a fraud, so they should not be subject to a constructive trust.

Second, a constructive trust may only be placed over identifiable property. "It is essential that the property subject to the trust, or the trust res, be ascertainable and sufficiently identifiable." *Uhlig, LLC v. Shirley*, No. 6:08-CV-01208-JMC, 2012 WL 2711505, at *2 (D.S.C. July 9, 2012) (citing 76 Am. Jur. 2d *Trusts* § 175); *see also Harmon v. Harmon*, 71 S.E. 815, 816 (S.C. 1911)

("[E]quity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrongdoer, but as long as it can be followed and identified in whosesoever hands it may come . . . ."). Here, the cash distributions at issued were made between nine and sixteen years ago. PCS has not identified any particular fund or property to which the constrictive trust is to apply. *See Uhlig*, 2012 WL 2711505 at *3 (refusing to impose a constructive trust where the proponent had not "identified any particular fund or property to which the constructive trust should apply"). Finally, in a constructive trust, the funds are held only for a single beneficiary and not for the benefit of all creditors.

The inapplicability of the constructive trust doctrine does not, however, leave PCS without a remedy. Usually, when a transfer is voided under the Statute of Elizabeth, the funds are returned to the transferor-corporation or -individual. Here, of course, a return of the funds to Ross is impossible because Ross is dissolved and no longer exists. The fact of Ross's dissolution should not operate to shield the Directors and Shareholders from liability for transfers void as fraudulent conveyances. The court therefore orders that a trust be established for the benefit of Ross's creditors, to be administered according to details to be determined at a subsequent time. The Ross Directors and Shareholders are hereby ordered to fund the trust with amounts equal to the distributions they received that have been voided by the court as fraudulent conveyances.

The court relies on its equitable power to effect this remedy. The fraudulent conveyance action is an equitable action. In equity, a federal court has the power to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944). "Flexibility rather than rigidity" is the hallmark of equity, which allows "for nice adjustment" between competing private claims. *Id*. In the circumstances of this case, the court invokes the equity maxim

48

that "equity will not suffer a wrong to be without a remedy." "The equitable power of a court is not bound by cast-iron rules but exists to do fairness and is flexible and adaptable to particular exigencies so that relief will be granted when, in view of all the circumstances, to deny it would permit one party to suffer a gross wrong at the hands of the other." *Hooper v. Ebenezer Sr. Servs. & Rehab. Ctr.*, 687 S.E.2d 29, 33 (S.C. 2009) (quotation and citation omitted); *see also Regions Bank v. Wingard Properties, Inc.*, 715 S.E.2d 348, 355 (S.C. Ct. App. 2011) ( "[W]here a substantive right exists, an equitable remedy may be fashioned to give effect to that right."); *Ex parte Dibble*, 310 S.E.2d 440, 442 (S.C. Ct. App. 1983) ("Courts have the inherent power to do all things reasonably necessary to insure that just results are reached to the fullest extent possible."). The creation of an express trust funded by the Ross Shareholders and Directors in the amount of the void distributions is a remedy that will vindicate the Ross creditors' right to void fraudulent conveyances.

Finally, the court notes that PCS has yet to establish the amount of response costs it has incurred at the Site above and beyond the share apportioned to PCS in the *Ashley II* litigation. This amount will represent the amount of the debt owed to PCS by Ross, in accordance with the apportionment scheme determined in *Ashley II*. PCS cannot, therefore, recover any of the funds in the trust until it establishes the amount it is owed as a subsequent creditor of Ross. *See PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 186 n.11 (4th Cir.), *cert. denied*, 134 S. Ct. 514, (2013) (noting that considering this court's "order denying modification of the money judgment explicitly recognized that PCS cannot recover from Ross until it has paid more than its proportionate share to Ashley. Considering the court's clarification on the record, we find no error in the form of the money judgment."); *see also Ashley II*, ECF No. 660 at 4 ("PCS cannot collect

49

upon its judgments against contributing tortfeasors until it has paid more than its share of the judgment entered in favor of Ashley . . . .").

Any funds remaining in the trust after the satisfaction of the debt established by PCS shall be returned to the Ross Directors and Shareholders on a *pro rata* basis. The trust is to be established pursuant to a subsequent court order to be issued after the court holds a conference with the parties after the entry of this order.

### III. CONCLUSION

Consistent with the foregoing, judgment shall be entered against the Ross Directors and Shareholders in favor of PCS on PCS's fraudulent conveyance claim. The distributions made to the Ross Directors and Shareholders between 1998 and 2006 are declared void. A trust is hereby established to be funded in the amounts disbursed to those directors and shareholders, which trust amounts to a total of $ 4,582,163.90. Judgment is entered against each Ross Director and Ross Shareholder for the amounts reflected in Appendix A.[8]

This court retains jurisdiction to coordinate and oversee enforcement of this judgment.

**IT IS SO ORDERED.**

                             s/ Margaret B. Seymour

                             Margaret B. Seymour

                             Senior United States District Court Judge

September 22, 2015
Columbia, South Carolina

---

[8] Appendix A was prepared from the Joint Stipulations, dated July 30, 2014, relating to the amount of the distributions. ECF No. 312. The amount reflects the amount of the distributions to each of the Ross Directors and Shareholders during the period 1998 through 2006.

**Appendix A**

**Total Distributions to the Ross Directors 1998-2006 Breakdown**

(Source: Docket Entry Number 312, Joint Stipulations, filed on July 30, 2014)

| Grayson Hanahan | | |
|---|---|---|
| 03/05/1999 | $ | 19,278.00 |
| 06/09/1999 | $ | 7,711.20 |
| Between 01/01/2000 and 03/05/2000 | $ | 4,337.55 |
| 05/29/2002 | $ | 24,097.50 |
| 10/18/2004 | $ | 48,195.00 |
| 08/08/2005 | $ | 24,097.50 |
| 07/12/2006 | $ | 17,350.20 |
| 12/13/2006 | $ | 932.31 |
| **Total** | **$** | **145,999.26** |
| | | |
| **William O. Hanahan, III** | | |
| 03/05/1999 | $ | 12,622.60 |
| 06/09/1999 | $ | 5,049.04 |
| Between 01/01/2000 and 03/05/2000 | $ | 2,840.09 |
| 05/29/2002 | $ | 15,778.25 |
| 10/18/2004 | $ | 31,556.50 |
| 08/08/2005 | $ | 15,778.25 |
| 07/12/2006 | $ | 11,360.34 |
| 12/13/2006 | $ | 610.45 |
| **Total** | **$** | **95,595.52** |
| | | |
| **Katharyne H. Rike** | | |
| 03/05/1999 | $ | 16,730.60 |
| 06/09/1999 | $ | 16,239.44 |
| Between 01/01/2000 and 03/05/2000 | $ | 3,764.39 |
| 05/29/2002 | $ | 20,913.25 |
| 06/09/2002 | $ | 5,967.00 |

| | | |
|---|---|---|
| 10/18/2004 | $ | 41,826.50 |
| 08/08/2005 | $ | 26,880.25 |
| 07/12/2006 | $ | 19,353.78 |
| 12/13/2006 | $ | 1,040.01 |
| **Total** | **$** | **152,715.22** |
| | | |
| **Mikell Scarborough** | | |
| 03/05/1999 | $ | 5,737.60 |
| 06/09/1999 | $ | 3,095.04 |
| Between 01/01/2000 and 03/05/2000 | $ | 1,740.96 |
| 05/29/2002 | $ | 9,672.00 |
| 10/18/2004 | $ | 23,344.00 |
| 08/08/2005 | $ | 11,672.00 |
| 07/12/2006 | $ | 8,403.84 |
| 12/13/2006 | $ | 451.58 |
| **Total** | **$** | **64,117.02** |

**Total Distributions to the Ross Shareholders 1998-2006 Breakdown**

(Source: Docket Entry Number 312, Joint Stipulations, filed on July 30, 2014)

| | | |
|---|---|---|
| **Ann Hanahan Blessing** | | |
| 06/09/1999 | $ | 5,829.28 |
| Between 01/01/2000 and 03/05/2000 | $ | 3,278.97 |
| 05/29/2002 | $ | 18,216.50 |
| 10/18/2004 | $ | 36,433.00 |
| 08/08/2005 | $ | 18,216.50 |
| 07/12/2006 | $ | 13,115.88 |
| 12/13/2006 | $ | 704.78 |
| **Total** | **$** | **95,794.91** |
| | | |
| | | |
| **Donald Buhrmaster, III** | | |
| 03/05/1999 | $ | 9,180.00 |
| 06/09/1999 | $ | 3,672.00 |
| Between 01/01/2000 and 03/05/2000 | $ | 2,065.50 |
| 05/29/2002 | $ | 11,475.00 |

| | | |
|---|---|---|
| 10/18/2004 | $ | 22,950.00 |
| 08/08/2005 | $ | 11,475.00 |
| 07/12/2006 | $ | 8,262.00 |
| 12/13/2006 | $ | 443.96 |
| **Total** | **$** | **69,523.46** |
| | | |
| **Eleanor W. Carter** | | |
| 03/05/1999 | $ | 34,220.40 |
| 06/09/1999 | $ | 13,688.16 |
| Between 01/01/2000 and 03/05/2000 | $ | 7,699.59 |
| 05/29/2002 | $ | 42,775.50 |
| 10/18/2004 | $ | 85,551.00 |
| 08/08/2005 | $ | 42,775.50 |
| 07/12/2006 | $ | 30,798.36 |
| 12/13/2006 | $ | 1,654.95 |
| **Total** | **$** | **259,163.46** |
| | | |
| **Margaret H. Carter** | | |
| 03/05/1999 | $ | 46,435.60 |
| 06/09/1999 | $ | 18,574.24 |
| Between 01/01/2000 and 03/05/2000 | $ | 10,448.01 |
| 05/29/2002 | $ | 58,044.50 |
| 10/18/2004 | $ | 116,089.00 |
| 08/08/2005 | $ | 58,044.50 |
| 07/12/2006 | $ | 41,792.04 |
| 12/13/2006 | $ | 2,245.69 |
| **Total** | **$** | **351,673.58** |
| | | |
| **Elizabeth Clark** | | |
| 03/05/1999 | $ | 52,737.00 |
| 06/09/1999 | $ | 17,310.80 |
| Between 01/01/2000 and 03/05/2000 | $ | 9,737.33 |
| 05/29/2002 | $ | 54,096.25 |
| 10/18/2004 | $ | 100,192.50 |
| 08/08/2005 | $ | 50,096.25 |
| 07/12/2006 | $ | 36,096.30 |
| 12/13/2006 | $ | 1,938.18 |

| | | |
|---|---|---|
| **Total** | **$** | **322,204.61** |
| | | |
| **Buist L. Hanahan** | | |
| 03/05/1999 | $ | 57,030.80 |
| 06/09/1999 | $ | 22,812.32 |
| Between 01/01/2000 and 03/05/2000 | $ | 12,831.93 |
| 05/29/2002 | $ | 71,288.50 |
| 10/18/2004 | $ | 142,577.00 |
| 08/08/2005 | $ | 71,288.50 |
| 07/12/2006 | $ | 51,327.72 |
| 12/13/2006 | $ | 2,758.09 |
| **Total** | **$** | **431,914.86** |
| | | |
| **Elizabeth A. Hanahan** | | |
| 03/05/1999 | $ | 17,671.60 |
| 06/09/1999 | $ | 7,068.64 |
| Between 01/01/2000 and 03/05/2000 | $ | 3,976.11 |
| 05/29/2002 | $ | 22,089.50 |
| 10/18/2004 | $ | 44,179.00 |
| 08/08/2005 | $ | 22,089.50 |
| 07/12/2006 | $ | 15,904.44 |
| 12/13/2006 | $ | 854.62 |
| **Total** | **$** | **133,833.41** |
| | | |
| | | |
| **Frances G. Hanahan** | | |
| 06/09/1999 | $ | 17,084.64 |
| Between 01/01/2000 and 03/05/2000 | $ | 10,172.61 |
| 05/29/2002 | $ | 56,514.50 |
| 10/18/2004 | $ | 113,029.00 |
| 08/08/2005 | $ | 56,514.50 |
| 07/12/2006 | $ | 40,690.44 |
| 12/13/2006 | $ | 2,186.50 |
| **Total** | **$** | **296,192.19** |
| | | |
| **Mary Ross Hanahan** | | |
| 03/05/1999 | $ | 36,720.00 |
| 06/09/1999 | $ | 14,688.00 |

| | | |
|---|---|---|
| Between 01/01/2000 and 03/05/2000 | $ | 8,262.00 |
| 05/29/2002 | $ | 45,900.00 |
| 10/18/2004 | $ | 91,800.00 |
| 08/08/2005 | $ | 45,900.00 |
| 07/12/2006 | $ | 33,048.00 |
| 12/13/2006 | $ | 1,775.83 |
| **Total** | **$** | **278,093.83** |
| | | |
| **Muriel R. Hanahan** | | |
| 03/05/1999 | $ | 16,629.40 |
| 06/09/1999 | $ | 6,651.76 |
| Between 01/01/2000 and 03/05/2000 | $ | 3,741.62 |
| 05/29/2002 | $ | 20,786.75 |
| 06/09/2002 | $ | 5,967.00 |
| 10/18/2004 | $ | 53,507.50 |
| 08/08/2005 | $ | 26,753.75 |
| 07/12/2006 | $ | 19,262.70 |
| 12/13/2006 | $ | 1,035.08 |
| **Total** | **$** | **154,335.56** |
| | | |
| **Roger Parke Hanahan, Jr.** | | |
| 03/05/1999 | $ | 38,977.60 |
| 06/09/1999 | $ | 15,591.04 |
| Between 01/01/2000 and 03/05/2000 | $ | 8,769.96 |
| 05/29/2002 | $ | 48,722.00 |
| 06/09/2002 | $ | 5,967.00 |
| 10/18/2004 | $ | 109,378.00 |
| 08/08/2005 | $ | 54,689.00 |
| 07/12/2006 | $ | 39,376.08 |
| 12/13/2006 | $ | 2,115.87 |
| **Total** | **$** | **323,586.55** |
| | | |
| **Grayson C. Jackson** | | |
| 03/05/1999 | $ | 52,632.20 |
| 06/09/1999 | $ | 21,052.88 |
| Between 01/01/2000 and 03/05/2000 | $ | 11,842.25 |

| | | |
|---|---|---|
| 05/29/2002 | $ | 65,790.25 |
| 10/18/2004 | $ | 131,580.50 |
| 08/08/2005 | $ | 65,790.25 |
| 07/12/2006 | $ | 47,368.98 |
| 12/13/2006 | $ | 2,545.37 |
| **Total** | **$** | **398,602.68** |
| | | |
| **Oriana H. Kirby** | | |
| 03/05/1999 | $ | 16,609.40 |
| 06/09/1999 | $ | 6,643.76 |
| Between 01/01/2000 and 03/05/2000 | $ | 3,737.12 |
| 05/29/2002 | $ | 20,761.75 |
| 06/09/2002 | $ | 5,967.00 |
| 10/18/2004 | $ | 53,457.50 |
| 08/08/2005 | $ | 26,728.75 |
| 07/12/2006 | $ | 19,244.70 |
| 12/13/2006 | $ | 1,034.11 |
| **Total** | **$** | **154,184.09** |
| | | |
| **Jeanne DeForest Smith Hanahan** | | |
| 03/05/1999 | $ | 16,609.40 |
| 06/09/1999 | $ | 6,643.76 |
| Between 01/01/2000 and 03/05/2000 | $ | 3,737.12 |
| 05/29/2002 | $ | 20,761.75 |
| 06/09/2002 | $ | 5,967.00 |
| 10/18/2004 | $ | 53,457.50 |
| 08/08/2005 | $ | 26,728.75 |
| 07/12/2006 | $ | 19,244.70 |
| 12/13/2006 | $ | 1,034.11 |
| **Total** | **$** | **154,184.09** |
| | | |
| **The Trust of William O. Hanahan, Jr.** | | |
| 03/05/1999 | $ | 92,488.60 |
| 06/09/1999 | $ | 36,995.44 |
| Between 01/01/2000 and 03/05/2000 | $ | 20,809.94 |
| 05/29/2002 | $ | 115,610.75 |
| 10/18/2004 | $ | 231,221.50 |

56

| | | |
|---|---|---|
| 08/08/2005 | $ | 115,610.75 |
| 07/12/2006 | $ | 83,239.74 |
| 12/13/2006 | $ | 4,472.88 |
| **Total** | **$** | **700,449.60** |
| | | |
| **Grand Total** | **$** | **4,582,163.90** |
| **(Ross Directors + Ross Shareholders** | | |